[Crim. No. 3807.   In Bank.—April 30, 1935.]

THE PEOPLE, Respondent, v. ETHAN McNABB et al., Appellants.

William L. Southwell for Appellants.

U. S. Webb, Attorney-General, and Ralph O. Marron and William F. Cleary, Deputies Attorney-General, for Respondent.

SEAWELL, J.—Ethan McNabb, William Bagley, Louis H. Downs, George Fredericks, and George W. Masters were accused by an indictment returned against them by the

grand jury of the county of Marin on March 21, 1934, with having committed on March 12, 1934, in said county, while undergoing life sentences in the state prison of this state at San Quentin, the offense defined by section 246 of the Penal Code. Said section reads as follows: "Every person undergoing a life sentence in a state prison of this state, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means or force likely to produce great bodily injury, is punishable with death." It will be noted that there is no alternative punishment.

All of the defendants, except Downs, who was allowed to sever, were placed on trial. Defendants McNabb and Bagley were found guilty by the jury and the death penalty has been imposed upon each of them. Fredericks and Masters were acquitted.

But two of the many questions raised upon the appeal taken by McNabb and Bagley may be said to merit serious consideration. However, we will give to others such consideration as they may be entitled to receive.

All of the defendants were, at the time of the alleged assaults, held on commitments for the commission of crimes which are punishable by imprisonment during the natural life of the offenders. In other words, the minimum as prescribed by statute was five years, but there being no maximum fixed by law in terms of years it is in effect a definite life term until and unless it is fixed by the state board of prison terms and paroles in due course at a lesser term of imprisonment. Verdicts of acquittal having been returned as to Fredericks and Masters, it is unnecessary to consider their status as to whether or not they were undergoing life sentences within the meaning of said section 246 of the Penal Code.

The only offenses involved in this appeal are robberies of the first degree, of which Bagley stands convicted of one of such offenses, and McNabb has suffered four such convictions. The penalty prescribed for robbery in the first degree is "not less than five years". (Pen. Code, sec. 213.) The maximum therefore is a life sentence, subject to be shortened by the action of the state board of prison terms and paroles, as provided by the provisions of section 1168 of the Penal Code. Until action is taken by said board

fixing a shorter duration of imprisonment than life it is uniformly held "that the indeterminate sentence is in legal effect a sentence for the maximum term. It is on this basis that such sentences have been held to be certain and definite, and therefore not void for uncertainty." (*In re Lee*, 177 Cal. 690 [171 Pac. 958], citing many supporting cases.)

Defendants complain that the court abused its discretion in refusing to grant their motion for a continuance of trial made three days prior to the trial day and after a long list of jurors had been summoned to attend before the court as trial jurors on the day set at the request of counsel for the defendants. The offense was committed on March 12, 1934.

The indictment was returned March 21, 1934. On March 27, 1934, the defendants were brought into court for arraignment, but being without counsel and upon the request of each for a continuance to enable him to secure counsel, the arraignment was continued to April 3, 1934. On April 3, 1934, all of the defendants were represented by counsel, W. L. Southwell, Esq., appearing for defendant Masters. All waived the reading of the indictment and upon their motion the time for entering their pleas was set for April 10, 1934. ■ On April 10, 1934, the defendants joined in a demurrer to the indictment setting forth a number of objections thereto. The district attorney, by direction of the court, amended the indictment which in its original form alleged the assault to have been made with "deadly weapons, to-wit, revolvers and guns, or an instrument likely to produce great bodily harm." The above-quoted allegation was particularly assailed on the ground that the indictment did not specifically describe either the revolvers and guns as loaded weapons, or the instrument in sufficient particularity that it could be said that it was an instrument likely to produce great bodily harm if used in an assault made upon the person of another, and, further, that it was open to the construction, by the use of the disjunctive particle *or*, that more than one offense was committed. Whether the indictment was legally defective or insufficient in the respects herein specified is of no consequence inasmuch as the indictment was amended by striking out said allegation as first framed and inserting in lieu thereof, "loaded revolvers and guns". There can be no doubt that the district attorney could have made the amendment without leave of court, as

the defendants had not yet entered their pleas. (Pen. Code, sec. 1008.) The defendants suffered no prejudice thereby. They were arraigned on the indictment as amended. The demurrer, which we will briefly advert to hereafter, was overruled, and each defendant entered a plea of not guilty. Counsel for defendants suggested themselves that the trial be set for May 21, 1934, and the order was accordingly made. Upon joint notice of the defendants' attorneys given on April 27, 1934, an order was made May 16, 1934, permitting them to inspect all guns, revolvers, ammunition, powder and accessories in the possession or custody of the sheriff of the county of Marin, the warden of the state prison at San Quentin and the district attorney of Marin County, taken from the defendants and which were to be used as evidence against them.

On May 4, 1934, W. L. Southwell made a motion on behalf *of all* the defendants for separate trials, which was denied except as to Downs, as above noted. On May 16, 1934, W. L. Southwell noticed a motion for May 18, 1934, to revoke the order setting said case on May 21, 1934, for trial and for a continuance to a future day. His grounds were, that Nathan Coghlan, Esq., who had appeared for McNabb, Bagley and Fredericks to that date, had informed him that he had received no fee or retainer from anyone and he could not longer continue in the case. Attorney Southwell stated to the court that the defendants other than Masters were without counsel and that he would be compelled to defend the other defendants "in order to properly defend Masters". This was true, as all of the defendants were charged with participating in the same attempt to subdue certain officers and guards of the state prison at San Quentin and thereby gain their way to liberty by force of arms in the furtherance of a conspiracy into which they had entered and promoted according to the admissions of McNabb as shown by his cross-examination and by other incontrovertible testimony and evidence in the case. All of the attorneys who had represented the several defendants acted jointly in open court in the preliminary stages of the proceedings, and it was agreed that in the absence of any one of said attorneys, any other of said attorneys present might act for and bind the absent attorneys. As a recognition on the part of the attorneys representing the

several defendants that each defendant was charged with being a participant in the commission of the same offense and that all of the attorneys were united in a common purpose, the following colloquy between the court and Mr. Coghlan upon arraignment, is significant:

"The Court: Ethan McNabb, have you secured counsel? A. Yes. Mr. Coghlan: I represent McNabb, if the Court please. The Court: In conjunction with other attorneys present, I believe? Mr. Coghlan: Yes, sir. The Court: Who is associated with you, Mr. Coghlan? Mr. Coghlan: Mr. Sullivan and Mr. Southwell, who are here present. The Court: Mr. Southwell? Mr. Southwell: Yes, sir. The Court: Are you ready for arraignment? Mr. Coghlan: Yes, Your Honor, but we will ask for time to plead."

Mr. Leo Sullivan represented Downs, who was later permitted to sever at the trial. While it is true that the stipulation as to joint representation was made at the arraignment, it is also true that it was also later recognized on motions made by Mr. Southwell on behalf of all the defendants in one or two other matters. Whether the attorneys were or were not associated in a common defense of all the defendants is not as important as is the question whether Mr. Southwell who defended McNabb, Bagley and Fredericks, jointly charged with his acknowledged client, Masters, upon the withdrawal of Mr. Coghlan, and who from the first had taken an active part in the preparation and presentation of his client's case, was not equally well prepared to represent the defendants McNabb, Bagley and Fredericks. He first appeared in court as attorney for Masters on April 3, 1934. The trial of all was set with his approval for May 21, 1934. He therefore had forty-eight days in which to prepare for trial. He was associated with and in conferences with Mr. Coghlan upon a number of motions affecting the interests of all of the defendants until May 14, 1934, when he was informed that Mr. Coghlan would not continue as attorney for McNabb, Bagley and Fredericks. He then had a week in which to adjust himself to the defense of the other three codefendants. He accepted employment and moved, three days before trial, for a continuance. We are satisfied, in the circumstances of the situation, that the court did not abuse its discretion in denying the motion. That the attorney was well prepared and

informed as to every possible phase of the case is borne out by the record of the trial which we have carefully read. It occupied eight trial days interspersed with three nontrial days. The transcript of the trial contains more than 1100 typewritten pages. The defense called 63 witnesses and subjected every witness called by the People to a very lengthy cross-examination. In short, the voluminous record is a formidable answer to any claim that counsel was not fully prepared for trial. The court freely granted such orders as the defense requested and granted every request made by the defendants that was calculated to give full opportunity to interview prisoners confined in the state prison or that would otherwise aid them in the preparation of their defense. There is no merit whatever in the claim of appellants to the contrary.

Appellants also urge as reversible error the fact that the indictment contained but one count and charged the defendants with an assault with a deadly weapon with malice aforethought as defined by section 246 of the Penal Code, made upon the persons of Fred H. Miller, Ernest Williamson, Charles Cleveland and John Hubert Arbuckle, all of whom were guards at said prison excepting Arbuckle, a convict, who was killed in the attempted break by the discharge of McNabb's revolver, as hereafter related. The defendants were arraigned under the amended indictment filed by leave of court and their pleas were entered thereon. It neither appears from the clerk's transcript nor from the proceedings as reported in the reporter's transcript on appeal that the amended indictment was demurred to, or that it was stipulated that said demurrer might stand against the amended indictment. The demurrer was both general and special and while it states in paragraph III thereof that more than one offense was charged therein in a ''manner not provided or permitted by section 954 of the Penal Code for the reasons, and all of them, alleged in paragraph I of this demurrer, and for the further reason that it is alleged, or attempted to be alleged, that the alleged assault was by revolvers and guns and also that it was committed by an instrument or instruments likely to produce great bodily injury'', it nowhere specifies the respect or particular in which said allegation offends against the provisions of section 954. Said section provides:

"An indictment, information or complaint may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more indictments or informations are filed in such cases the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the indictment or information, but the defendant may be convicted of any number of the offenses charged, and each offense upon which the defendant is convicted must be stated in the verdict; provided, that the court in the interest of justice and for good cause shown, may, in its discretion, order that the different offenses or counts set forth in the indictment or information be tried separately, or divided into two or more groups and each of said groups tried separately. . . . "

Conceding that the demurrer directed at the original indictment did not lose its potency as to the amended indictment, it did not comply with the requirements of section 1005 of the Penal Code, which provides as follows: " . . . It [the demurrer] must distinctly specify the grounds of objection to the indictment or information, or it must be disregarded."

■ A demurrer lodged under the provisions of section 954, Penal Code, is special, and does not challenge the indictment on the ground that the facts stated do not constitute a public offense. As a matter of fact, any reference made by the joint demurrer to the uncertainty of the indictment with reference to the provisions of section 954 is of the most general and casual character, and the particular question as affected by section 954 was not so much as raised upon argument. It was not urged until the motion in arrest of judgment was made. It in no way involved a question of jurisdiction. The defendants were in fact assaulting four designated persons in furtherance of a conspiracy to overcome the guards of the prison by force and fear, to the end that they might escape from prison. Of course the admitted plot necessarily took into consideration an assault, not upon one, but upon several. That the indictment in its one and only count alleged that the assault was made upon four designated persons could not, in consideration of the plan adopted by the defendants to accomplish their purpose,

have prejudiced or misled the defendants, or prejudiced their case with the jury. The conclusive evidence as to this fact is to be found in the result of the trial inasmuch as two of the defendants were acquitted, which proves that the jury was in no way confused by the form of the indictment. Section 960 of the Penal Code provides: "No indictment, information, or complaint is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits." Certainly the appellants suffered no prejudice by the form of the indictment. This being so, under repeated holdings of this court, rendered in obedience to the mandate of article VI, section 4½, of the state Constitution, adopted November 3, 1914, the contention of appellants is of no avail. After an examination of the entire cause, including the evidence, we are of the opinion that the error complained of, if error it was, did not result in a miscarriage of justice. (State Const., art. VI, sec. 4½.)

■ Appellants made the claim and produced evidence to support it that Mrs. Helen Walsh, the wife of a member of the grand jury which returned the indictment against the defendants, and Mrs. Walter S. Mills, her sister, were summoned as jurors and served as such at the trial. On the last day of the trial, May 4, 1934, the defendants filed a motion for an order declaring a mistrial on the ground of the relationship of said jurors to said member of the grand jury which returned the indictment. The motion seems to have been formally presented upon the motion for new trial and was made on the following grounds: 1st. For implied bias on the part of said jurors as defined by section 1074, subdivisions 1 and 2 of the Penal Code. Section 1074 of said code provides that a challenge for implied bias may be taken for certain enumerated causes *and for no other*. Subdivision 1 thereof provides that a challenge may be taken by reason of "consanguinity or affinity within the fourth degree to the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or to the defendant". Subdivision 2 thereof provides: "Standing in the relation of guardian and ward, attorney and client, master and servant, or landlord and tenant, or being a member of the family of the defendant,

or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or in his employment on wages."

The second ground of objection to said jurors is urged under the provisions of section 1071, subdivisions 1 and 2, of the Penal Code, which provides: "A challenge for cause may be taken by either party. It is an objection to a particular juror, and is either: 1. General—that the juror is disqualified from serving in any case, or 2. Particular—that he is disqualified from serving in the action on trial."

The subdivisions of section 1074 relied upon have no application whatever to the case before us, as it is not claimed that said jurors were related in any degree to any of the persons alleged to have been injured by the assaults or to the person upon whose complaint the prosecution was instituted. Neither does it appear that said jurors were disqualified from serving in any case or in the action on trial. ■ Section 1074 of the Penal Code enumerates all of the causes for challenges for implied bias that may be taken and it *ex industria* provides that no challenges for any other causes will be allowed. Subdivision 4 provides that "having served on the grand jury which found the indictment" constitutes a cause for challenge. If relationship within any degree of consanguinity or affinity was intended to be a cause of challenge on the ground of implied bias the statute would have so stated. The expression of one excludes the other.

It is the law of this state that a female is placed on equal terms with males in matter of jury service. The wife is a separate person from her husband and his views or opinions concerning the performance of public duties are not necessarily hers. The two jurors objected to herein were fully examined on their *voir dire* as to their frame of mind toward the defendants and nothing appeared then or appears now to indicate that they could not and did not give the defendants a fair trial, or that they were affected by prejudice. The causes for challenge for implied bias are specifically set forth, section by section, and if counsel for the defendants desired for any reason to know if any relationship existed between said jurors and any member of the grand jury he should have interrogated them on that subject. It is common practice for the attorney for the defendant in such cases to inquire of the prospective juror if he is ac-

quainted with or if he has discussed the merits of the case with any member of the grand jury which returned the indictment, or if he is related or associated with any member of that body. Mere relationship to a member of the grand jury is not a disqualification nor a cause of challenge. Subdivision eight of section 1074 of the Penal Code is the only portion of said section which disqualifies a person otherwise qualified to serve from acting as a trial juror. It provides that if the offense is punishable with death, and the person entertains such conscientious opinions as would preclude his finding the defendant guilty, he must neither be permitted nor compelled to serve. All other causes may be waived. The only challenge which defendants could have exercised would have been a peremptory challenge provided they had not exhausted all of such challenges. The examination of the jurors here objected to shows that they were qualified to act fairly and impartially in the matter. They did, as a matter of fact, join in acquitting two of the defendants who undoubtedly aided and abetted the principal actors in the studied plot to escape from prison.

We now come to the crux of appellants' objections against the judgment imposing the death penalty which forms the basis for most of the objections raised by demurrer and motions of various kinds. It is thus set forth in appellants' statement of questions involved on appeal: ''Is a person undergoing an indeterminate sentence of five years to life, undergoing a life sentence within the meaning of section 246 of the Penal Code; . . . ''

A brief recital of the circumstances of the assaults and the effect of the commitments under which the defendants were imprisoned is necessary to an understanding of the issues as to whether the assaults were made with malice aforethought, which is made an essential element of the offense, and also whether they were undergoing a life sentence.

McNabb is approximately thirty-eight years of age, and so far as the record discloses any information as to his life, pursued the ways of a daring habitual criminal. He was received at San Quentin prison March 7, 1923, having been convicted on two separate counts of robbery of the first degree. On March 30, 1924, his term of imprisonment was fixed at fifteen and five years respectively. On March 9,

1927, he was released on parole. On September 6, 1929, he was delivered to the warden of the Folsom state prison upon a certified copy of a judgment of conviction under two counts of robbery of the first degree committed while he was released on parole. On December 14, 1931, he was transferred to the state prison at San Quentin, as a parole violator, with two consecutive counts of first degree robbery and two prior convictions of robbery against him, to run consecutively with the instant term. His parole was revoked and his credits were forfeited. On March 12, 1934, while serving said sentence he with other prisoners, in a pre-arranged plan, made the assaults with deadly weapons, for which he and Bagley stand convicted. Bagley was at the time serving a sentence for first degree robbery, the maximum penalty of which is life imprisonment.

At about 8:15 A. M. on March 12, 1934, Fred H. Miller, a guard, while on his tour of inspection, was told by Downs, a prisoner, jointly charged, that two prisoners had a bottle of whiskey in the electrical shop. This of course was a ruse. He went to the electrical shop to investigate the report and found no one in the shop but Masters who thrust a pistol to his stomach. As he stepped back someone struck him on the head. His "sap" or blackjack was at the same time taken from his back pocket, doubtless by McNabb. He was ordered to go into the rear room by McNabb, who held in his hand a pistol which he used to enforce his order. McNabb also took from Miller his cane. Guards in the yards are not permitted to carry firearms. McNabb forced him to disrobe. McNabb put on Miller's trousers, coat, vest and cartridge belt and holster. At this juncture Bagley came down a stairway and entered the room and tied Miller's hands and legs with telephone wire. McNabb, Bagley and Fredericks each tied seven or eight convicts who chanced to be in the room. While McNabb was tying a convict by the name of Arbuckle and placing him in a prone position on the floor his pistol fell from the holster. He placed it back in the holster and as he bent over it again fell from the holster and was discharged. The bullet passed through the body of Arbuckle, fracturing the spinal vertebra in its passage and he died a short time thereafter without regaining consciousness. McNabb and his confederates had placed the seven or eight convicts, whom they had bound,

back to back on the floor. McNabb, asked in examination as a witness if he knew that Arbuckle had been shot, said he did not, but admitted that upon the request of one of the convicts who was tied that Arbuckle's head be taken off his feet, he reached down and "pushed the man's head over to one side to take the weight of the man's head off the other convict's legs that he was complaining about". He claims even then that he did not notice that Arbuckle was wounded. Others easily observed that the man appeared to be dying as he paled and blood was coursing down his neck. Those active in tying the guard and prisoners in the electrical room were McNabb, Bagley, Downs, Fredericks and Masters. McNabb, Downs, Masters and Bagley had guns. After the tying of the guard and prisoners, a signal "O. K." was sounded, showing concert of action, and a ladder was quickly sawed in two, one part of which was attached to another ladder to make it of sufficient length to scale the prison walls. Downs was at the front end of the ladder and Masters was at the rear end and McNabb, wearing the guard's uniform, was leading. They were also carrying a coil of wire or rope. In proceeding down an alley to the point on the grounds where they had planned to attack the guards in the boxes and make their escape, the uniform worn by McNabb served to mislead the guards on duty at the gates and they were permitted to pass unmolested to wall No. 6. Guard box No. 6, which is built on the wall at this point, was occupied by Guard Ernest L. Williamson. He saw McNabb, Downs and Masters approach and halt at a point beneath his guard box. Bagley was near by at the corner of the furniture factory building. As McNabb stood almost beneath Williamson he said to him: "Ernie, pass your rope down and pull up this coil". A rope is kept in the guard boxes for hoisting purposes. Williamson, taking him to be a guard, left his rifle in the box and stepped out on the wall with the rope in his hand. He asked McNabb what he was going to do with the ladder. McNabb instantly drew a pistol and pointed it at him, said, "Stand there cr I'll kill you". He stood still for a second and then suddenly dove for the guard box in which he had his rifle and as he did so McNabb fired at him. The bullet passed over his shoulder as he dove into the box, and in its course cut through both walls of the

box. Another shot took off the top of a large faucet attached to a stove and glanced into the wall of the box. Another shot went into the facing of the door near Williamson's head. Williamson fired three shots. Bagley shot at the guard in Box No. 7. He also fired two shots at guard Holmes and took three shots at officer Fred M. Hogeboom as he was crossing the yard. Bagley fled into the coal bin and Hogeboom followed him in. Bagley pointed his pistol at a guard at close range but it misfired. Hogeboom knocked Bagley down with his cane and he came to his feet with a drawn knife or dagger, which McNabb admitted he had furnished. Bagley was knocked down the second time. During the struggle or immediately before, he cached his pistol between sacks of coal. His knife, cartridge belt containing loaded leaded cartridges, and knife scabbard, were taken from him. At the beginning McNabb stood with his pistol aimed at box No. 6 and held the guard, who was warned not to expose himself, at bay for some time, when he was finally seized by guard Robert Posthumas who made a surprise attack upon McNabb from the rear by a circuitous route and a hard struggle ensued until McNabb was overcome by a guard striking him on the head with a cane, and, with the assistance of two or three other guards, he was taken to the captain's office. Nels Peterson, a guard, was made to stand aside by McNabb, with a threat if he did not do so he would kill him. A loaded pistol, a cartridge belt containing loaded cartridges, pistol holster and a knife with an eight inch blade were taken from McNabb. The ladder carriers fled during the shooting. A pistol which had been discarded by one of the assailants was afterwards found which in all probability was Fredericks' weapon. The number of shots fired by McNabb, Bagley and guard Williamson is not certain but quite a number were fired. That both McNabb and Bagley shot to hit their marks, there can be no reasonable doubt. Bagley was shot through the legs but the wounds were probably minor ones.

McNabb claims to have manufactured the powder used to propel the bullets, which were dum-dum, and also to have manufactured or assembled the pistols, which were unusually large and menacing in appearance. He had had some experience as a mechanic and when on the witness stand displayed considerable knowledge as to the manufacture of

explosives and the mechanical parts of firearms. The explosives were of a strong dynamic quality. The suggestion of appellants that they were not mechanically suited for their purpose and were weak in destructive force is sufficiently answered by the fact that one bullet passed entirely through the body of Arbuckle fracturing the vertebra of the spinal column, and another passed through both sides of the guard's cage, and others fired by Bagley were deeply imbedded in wooden timbers which were exhibited to the jury, and needs no further comment. That the weapons were deadly was admitted by McNabb who in explaining to the jury the reason of their possession of weapons, said that upon gaining their liberty they expected to take to the mountains and the pistols were to be used in killing game for food. The nature of the assault and the preparation made by McNabb and Bagley for its commission—which had been suspected by the officers for some time before the attack was made—also removes all doubt as to whether it was within the meaning of section 246 of the Penal Code. ▮ It will be noted that said section provides that every person undergoing a life sentence, "who, with malice aforethought, commits *an assault upon the person of another* with a deadly weapon" is subject to the penalty therein prescribed. It is not required that the assault be made with the *intent to kill*. The two essential elements as to the assault are malice aforethought, and the use of a deadly weapon. Malice aforethought is a term ordinarily used in connection with the felonious killing which is murder to designate it from manslaughter. The words do not imply deliberation or the lapse of considerable time between the malicious intent to take life and its actual execution, but rather denote *purpose* and *design* in contradistinction to accident and mischance. (See Bouvier's Law Dictionary, vol. 2, p. 2068.) In our statute it is used to denote the purpose and design of the assaulting party, both of which elements are too apparent in the instant case to require further discussion.

▮ The only remaining question which merits consideration is the one most strongly stressed by appellants, to wit: were appellants "undergoing a life sentence" at the time they committed the assaults? The authorities of this and many sister states which have an indeterminate sentence law similar to ours hold that a statute which prescribes a mini-

mum sentence of not less than five years and with no maximum is in law a life sentence until and unless a court or executive board charged with the duty of fixing prison terms remits a portion of the life term. This question was definitely settled by *In re Lee,* 177 Cal. 690 [171 Pac. 958], in 1918 and has been the pronounced law of the state since. Every person is charged with a knowledge of its existence. The fact that section 246 of the Penal Code was adopted in 1901, at a time trial courts pronounced a fixed term of imprisonment, can in nowise affect the operation of the present rule of law as declared in *In re Lee, supra.* ▮▮▮ The fact that appellant McNabb was returned to prison upon two convictions of first degree robberies committed while released on parole and was required to serve out the uncompleted terms of imprisonment by reason of breaking the terms of his parole did not suspend the force of the commitments upon which he was held. Had he been discharged or released from serving the uncompleted terms by a writ of *habeas corpus* or by pardon he would have still been held as a prisoner serving a life term on said later commitments. We think the contention of appellant McNabb to the effect that a person is not undergoing a life sentence within the purpose and meaning of the law, when imprisoned on a judgment which imposes the longest term known to the law and to which nothing further may be added, because, forsooth, he is also held on a prior uncompleted sentence for years does not stand the test of reason. Section 669 of the Penal Code relied upon, is not germane to the subject. It has to do with time served in terms less than life. It does not purport to say that a person is not undergoing a life sentence when delivered on a certified copy of the judgment of conviction to the warden of the state prison. The prisoner is undergoing a life sentence whatever may happen and he is held as such a prisoner by virtue of said judgment. The lawmakers had no thought of attempting to impose additional time to the longest possible span of time or of supplementing the infinite with the finite. The whole is greater than any of its parts. The proposition contended for reduces itself to an absurdity. The lawmakers had no thought of a life sentence when the section was adopted. It was dealing with consecutive terms of imprisonment for a term of years. That the appellants, one with four convictions of first degree

robbery standing against him, and the other with at least one, well knew that their life sentences would not be remitted, is strengthened by the fact that the five prisoners who engaged in the assault were all serving life sentences.

Bagley's appeal does not contain all the objections made by McNabb. The rulings made herein, however, dispose of all points presented by appellant Bagley.

Section 246 of the Penal Code was enacted as a disciplinary regulation and as a means of protection to prisoners themselves against the assaults of the vicious, and also to protect the officers who are required to mingle with the inmates, unarmed. This section is fully discussed in *People* v. *Finley,* 153 Cal. 59 [94 Pac. 248] (approved in 222 U. S. 28 [32 Sup. Ct. 13, 56 L. Ed. 75]). It is applicable to the facts of appellants' case in every sense. It is also specifically held that it is sufficient to charge the offense in the language of the statute.

We have examined the court's charge to the jury and every exception taken by appellants. We find it to be full and fair and supported by the sections of the Penal Code and the decisions of this state applicable to the case.

Throughout the case the learned trial judge ruled with impartiality and upon several occasions showed very great forbearance. We find no prejudicial error in the court's rulings upon questions of the admissibility or exclusion of evidence.

The orders and judgments appealed from by appellants are and each of them is hereby affirmed.

Thompson, J., Waste, C. J., Shenk, J., and Curtis, J., concurred.

Rehearing denied.