[Crim. No. 2239.    First Dist., Div. Two.    Oct. 30, 1942.]

THE PEOPLE, Respondent, v. FRANK L. SIGEL et al., Appellants.

Leo A. Sullivan for Appellant Sigel.

Willard W. Shea, Public Defender, and Joseph R. Deasy, Assistant Public Defender, for Appellant Elkins.

Earl Warren, Attorney General, David K. Lener, Deputy Attorney General, Ralph E. Hoyt, District Attorney, and James F. Coakley, Assistant District Attorney, for Respondent.

STURTEVANT, J.—In the above entitled case Frank L. Sigel, Benjamin Elkins, Walter Simpson, and Richard Roe, were all charged by indictment with the crimes of grand theft, robbery, extortion and kidnapping. At the time of the

trial the defendants Sigel and Elkins only had been apprehended and they were jointly tried and both convicted of the first, second, and third counts of the indictment and acquitted of the fourth. The defendant Elkins only has filed briefs.

The complaining witness, George Acheson, is 53 years of age and is a salesman for an oil company in San Francisco which specializes in the manufacture of materials for surfacing roads and highways. He left his home in Berkeley on December 25, 1939, and took a train to Seattle for the purpose of closing a contract with the city of Seattle. Acheson had previously been in said city for the purpose of negotiating a contract and his present trip was made pursuant to a telephonic request of the purchasing agent of said city. He arrived in Seattle on the evening of December 26, 1939, and registered at the Olympic Hotel. Leaving his room, he intended to go to the coffee shop in the hotel basement but after arriving on the first floor he decided to go for a short walk. Leaving the hotel, he walked several blocks down Fourth Avenue and as he was returning to the hotel he stopped at a lavatory in the public library. The entrance to this lavatory was on Fourth Avenue and could be entered without going into the library itself. As he was walking out the doorway to the sidewalk, he saw defendant Sigel, who remarked that the lavatory was untidy. Acheson made some reply in answer thereto and continued on to the Olympic Hotel, which was about one block away. Sigel walked beside him to the hotel and as Acheson approached the entrance, Sigel asked if he lived there. Acheson replied that he was staying there, whereupon Sigel asked him if he was in the lumber business and remarked that the wood paneling on the mezzanine floor was of unusual quality and design and suggested that Acheson see it. Sigel then turned and walked up a short stairway, followed by Acheson. When he reached the top he turned around quickly, at which Acheson noticed that Sigel's pants were unbuttoned and that part of his underclothing was visible. Acheson turned to descend and as he did so a second man appeared (hereinafter called number two man) and told Acheson that he was under arrest, at the same time holding his hand in his pocket in such a manner as to lead Acheson to believe that he had a gun. The number two man also exhibited a badge, as did Sigel, who buttoned his clothing, and said to the number two man, ''This is the fellow, we caught him.'' These men then carried on a rapid con-

versation between themselves, stating that the churches and newspapers of Seattle had been after the police department for a series of sex crimes; that the witness was a degenerate, that he was under arrest; that the chief would be happy in clearing up the matter.

Acheson was then taken out of the hotel to a car which was parked nearby, where they said to him, "You don't look like a degenerate. My God, you ought to be dead." They told him that they ought to get rid of him and suggested taking him to the hospital to see his victims. They then got into the car and drove for several blocks, when the car was stopped and the number two man got out and informed him he was going in to book him. In a few minutes the number two man returned and said that they had to go back to the hotel and search Acheson's room, at the request of the chief. After getting to the room, Sigel began going through all of Acheson's luggage and personal effects, while the number two man itemized the various articles that were found. Among the articles examined was a savings account book of the American Trust Company in Berkeley, showing a balance in Acheson's name of approximately $20,000. Acheson was questioned regarding his business, his purpose in being in Seattle at that time, his appointment with the purchasing agent the following day, and also his destination after leaving Seattle and his expected time of departure on the following day for Salem, Oregon.

The following day Acheson completed his business with the purchasing agent of Seattle and in the afternoon went to the railroad station to get a train for Salem, Oregon, where he also planned to transact some business, of which he informed Sigel and the number two man. While waiting for the train the number two man and the appellant Elkins approached him at the depot. Elkins flashed a badge and accused Acheson of trying to run away; Elkins told him that the detectives of the night before had not done their work; that they had no business to let him go; that he would have to return to the police station. During this conversation Elkins seized Acheson by the arm and shoved him around; he is lame and off balance and he stumbled. He thought they were crooked police officers taking his money. They then left the station, Acheson between Elkins and the number two man, both holding to his arms. They took him two or three blocks away to the doorway of a vacant building and

went through his pockets and wallet, where they found certain credentials indicating Acheson was a member of the Masonic Lodge. Upon seeing these credentials, Elkins then said to him it was too bad, he would have to do something for him. The number two man then left, saying that he was going across the street to see the judge. The conversation then turned to the matter of a bail bond and Elkins suggested Acheson write a check for $800 and that, plus $200 which Acheson had in his wallet, would be sufficient bail. Elkins then gave Acheson a fountain pen and the latter wrote out a check for $800 and handed it over, together with the $200 cash. Elkins then took Acheson back to the railroad station, where the latter boarded the train to Salem.

On February 2, 1940, at about 11 a. m., Acheson received a phone call at his office in the Monadnock Building in San Francisco, purporting to come from a man named Davis, relating to life insurance. A few minutes later Elkins appeared and told Acheson to come out in the hallway of the building. When Acheson got in the hallway he saw a man who has since been identified as Walter Simpson, referred to in the transcript as number four man. He put something hard against Acheson's back and commanded him to keep walking to the end of the hallway. At that point the number four man exhibited a badge and stated he was an inspector from the Seattle Police Department; that the other officers in Seattle were on the spot and were going to lose their jobs; that he would have to return Acheson to Seattle to stand trial for the sex crimes which he had committed. They told Acheson they were going to take him to the San Francisco Police Department. They took him down Kearny Street and on the way threatened to shoot him, the witness testifying in this respect: "Well, they referred to these crimes again, as they had in the past, referred to the dirty mess, it would be better to shoot me, to get rid of me, throw me in a slough." At the end of the first block off Market, they pushed him into a doorway and went through his pockets and found his Masonic credentials, whereupon the attitude of number four man changed, he professing that he too was a Mason, that he was going to help him; that they could not go to the Chief of Police in San Francisco because he was of a different religion; that he would call the Chief of Police at Seattle, who was a Mason. They then took him to the lobby of the Palace Hotel. Elkins stayed with him while the number

four man went to a telephone booth. Elkins told him that the number four man went to a telephone booth. Elkins told him that the number four man could take care of him. The number four man then returned and told him it would take $2,500 to clear the thing; that he would have to produce $2,500. Acheson told him that he did not have the $2,500; they replied: ''We will go over to Berkeley and get it.'' They then took Acheson and boarded a train for Berkeley. While on the train to Berkeley, there was some conversation about the witness being a degenerate, of taking him back to Seattle to stand trial, which they said would ruin him and his family. The number four man was Walter Simpson, a party defendant, who said to Acheson: ''If you think we are fooling, feel this.'' He put Acheson's hand on an object, which felt hard and like a gun of some kind. It felt like a gun and he thought it was a gun.

Upon arriving at the bank in Berkeley, Acheson withdrew $2,500 from his savings account, which he deposited in his checking account, then cashed a check for $2,500. The money was handed to Simpson on the train while returning to San Francisco, near Ashby Station in Berkeley. Upon arrival at the Terminal Station in San Francisco upon their return, they took him back to the lobby of the Palace Hotel, where they told Acheson they were quite sure everything would be all right; that he should go back to his office and go to work; that everything would be taken care of. Simpson told him he would phone him the next morning after talking with the chief in Seattle. Immediately upon his return to his office, Acheson telephoned the District Attorney of Alameda County and told him what had happened. After he spoke to District Attorney Hoyt, Simpson phoned him and told him he had been in touch with Seattle; that everything was all right; that everything had been taken care of.

Acheson believed at all times that Sigel, Elkins and Simpson were police officers of the Seattle Police Deparment; that they were corrupt officers; they told him the money was going to the Chief of Police of Seattle; Simpson showed him a badge and said he was an inspector of the Seattle police; he paid the money because he feared for his life and that he would be taken back and charged with these sex crimes. Elkins confessed his participation in the crime and implicated Sigel.

The defendant Elkins contends that the verdicts are

inconsistent. He cites and relies on *People* v. *Werner,* 29 Cal. App.2d 126 [84 P.2d 168]. It is not in point. In that case the defendant was charged with two different offenses which involved two different inconsistent intents on his part. The defendant quotes authorities to the effect that robbery and extortion involve two different intents on the part of the victim—not on the part of the defendant. The foregoing statement of facts shows that one group thereof tended to prove grand theft, another group to prove robbery, and still another group to prove extortion. The accused could have been guilty of all three offenses if he intended to commit them. If he intended to commit but one offense he was guilty of but one. An examination of the facts recited above discloses that the defendant and his associates intended but one offense and that there was but one taking. That act was the taking of $2,500 from the complaining witness Acheson. Conceding that the offense might have been grand theft, robbery or extortion, according to which group of facts the jury relied on, one offense and not three was committed. (*People* v. *Stephens,* 79 Cal. 428, 430 [21 P. 856, L.R.A. 845].) The sentences ran concurrently. The defendant's punishment on the first count may be not less than one nor more than ten years. (Pen. Code, § 489.) On the second count, robbery, his punishment may be not less than one year. (Pen. Code, § 213.) On the third count, extortion, the punishment may be the same as on the first count. (Pen. Code, § 520.) When, as here, the term of imprisonment imposed is for not less than a designated number of years, the maximum punishment is a life term. (*People* v. *McNabb,* 3 Cal.2d 441, 444 [45 P.2d 334].) We think it is clear, therefore, that the record shows the commission of one unlawful act; that said act was properly pleaded under three different statutes; and that in pronouncing judgment on each count and causing the judgments to run concurrently the defendant has been punished but once for his said wrongful act. The court followed the provisions of the statute (Pen. Code, § 654) and the approved practice. (*People* v. *Kynette,* 15 Cal.2d 731, 761-762 [104 P.2d 794].)

While instructing the jury the trial court read section 954 of the Penal Code. The defendant contends the trial court erred. He claims that the instruction had the effect of telling the jury that it could find the defendant guilty on

both of two inconsistent charges. Comparing section 954 with section 654, it is quite clear that the instruction had no such meaning.

Finally the defendant contends that the trial court of its own motion should have instructed the jury that it could find defendant guilty on only one of the counts contained in the indictment. We think not. Not intimating that the defendant was entitled under any circumstances to such an instruction, it is clear that the trial court was not bound to give the instruction of its own motion. (8 Cal.Jur. 309, and cases there cited.)

*Appeal of defendant Sigel.*

The cause was placed on the court's calendar to be heard September 14, 1942. Both defendants were fully notified. On the calling of the calendar both defendants Elkins and Sigel requested ten days within which to file a brief. Later the defendant Elkins waived his right to file a brief. Although again notified the defendant Sigel did not file a brief within the time allowed and has not since filed one. On October 28, 1942, the appeals of both defendants were ordered submitted.

The judgments and orders appealed from are affirmed.

Nourse, P. J., and Spence, J., concurred.

Appellant Elkins' petition for a hearing by the Supreme Court was denied November 27, 1942.