[Crim. No. 5656. In Bank. Apr. 26, 1955.]

THE PEOPLE, Respondent, v. HAROLD E. BERRY, Appellant.

William Kirk Stewart and Thomas S. Montgomery, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

SPENCE, J.—Defendant, while confined in Soledad State Prison, was charged with violating section 4500 of the Penal Code. That section provides: "Every person undergoing a life sentence in a State prison of this State, who, with malice aforethought, commits an assault upon the person of another . . . by any means of force likely to produce great bodily injury, is punishable with death." The jury found defendant guilty of the offense and sane at the time of its commission. Defendant appeals from the judgment of conviction and from two orders denying his motions for a new trial.

Defendant contends, with regard to the main trial on the issue of guilt: (1) That section 4500 is unconstitutional in failing to define the element of "malice aforethought"; (2) that there was insufficient evidence to establish that he was undergoing a life sentence; (3) that evidence of the victim's death was improperly admitted; and (4) that the trial court erred in defining "malice" in general terms in the instructions. Defendant further contends, with regard to the trial on the issue of sanity: (5) That the findings of the two court-appointed alienists were not made in accord with his rights as prescribed by section 1027 of the Penal Code; (6) that the trial court erred in instructing the jury on the presumption of sanity; and (7) that the long-accepted legal test of sanity based upon knowledge of "right and wrong" should be changed by overruling the prior decisions. Our examination of the record compels the conclusion that defendant's contentions are without merit.

Defendant took an iron bar approximately 24 inches long and 1 inch in diameter, a part of a clothes-pressing unit, and struck a fellow prisoner, Johnnie Nelson, two blows over the head, cracking his skull. The attack occurred about 9:30 a. m., March 16, 1954, while both defendant and Nelson were at work in the laundry. As the result of the extensive skull fracture and brain damage, Nelson died that night.

While at breakfast on the morning of the attack, the two men engaged in a heated argument, and Nelson apparently had agitated defendant by mimicking the latter's muscular twitching or facial "tick." The guard on duty that morning testified that he heard the two men arguing; that defendant told him that he, defendant, was going to kill Nelson if he did not stop agitating him; and that defendant stated that he "was in for murder" and was "not afraid to draw blood." Defendant and Nelson were thereafter locked in their cells, which were within visual range of each other. They were released about 8 o'clock that morning to go to work. Defendant claimed that he tried to keep busy with his laundry duties so as to forget Nelson but he could not, with the result that he finally grabbed the iron bar and struck Nelson. There were some fifty persons working in the laundry at the time. Fellow inmates testified that they observed defendant stand with the bar in his hand some two or three minutes awaiting the chance to strike Nelson from the back—the first blow felling Nelson and the second hitting him as he lay on the floor.

After the assault defendant ran into the laundry office. At the direction of the laundry supervisor, defendant dropped the bar to the floor. He repeatedly said: "I hope I killed him, I hope I killed him, the punk." As Nelson was carried on a stretcher past defendant on the way to the prison dispensary, defendant spat in his face and wished him dead, adding "If you don't (die), it isn't my fault." Defendant was then taken to the captain's office, where he freely and voluntarily told prison officials about the morning's events, admitting his attack on Nelson in these words: "I don't know what I hit him with or how many times. All I know is I hit him." Defendant apparently realized that he could "be gassed" for the crime, for he said: "I am serving a life sentence and I know that it is automatic, if you draw blood on another man while you are under a life sentence, it is an automatic gas chamber sentence."

Defendant analyzes the crime specified in section 4500 of

the Penal Code as one consisting of four elements: (1) an assault; (2) with force likely to produce greatly bodily injury; (3) committed with malice aforethought; (4) by a person undergoing a life sentence in a state prison. He admits elements (1) and (2)—the assault on Nelson with the stated force—but he claims that there was no evidence to prove elements (3) and (4)—the required malice aforethought and his status as a life-term prisoner. Neither contention has merit.

Defendant argues that the failure of the Legislature to define the term "malice aforethought" renders the statute unconstitutional for uncertainty, and the courts may not supply the meaning without violating the principle of the separation of powers. (Const., art. III, § 1.) It is a sufficient answer to state that such argument overlooks the statutory history of the section and its interpretation. In 1901, the statute now numbered section 4500 was enacted as section 246 of the Penal Code. (Stats. 1901, ch. 12, p. 6.) In *People* v. *McNabb* (1935), 3 Cal.2d 441, at page 456 [45 P.2d 334], this court construed "malice aforethought" as used in section 246 to "denote *purpose* and *design* in contradistinction to accident and mischance." In 1941, section 246 was repealed and reenacted, in identical wording as section 4500. (Stats. 1941, ch. 106, § 15, p. 1124.) When the Legislature so acted, it is presumed to have known of the prior decision construing the language of the earlier statute (*In re Halcomb*, 21 Cal.2d 126, 129 [130 P.2d 384]) and to have used the identical language in the later statute with the intent that it be given the same meaning. (*People* v. *Superior Court*, 118 Cal.App.2d 700, 703 [258 P.2d 1087], and cases cited.) Accordingly, the term "malice aforethought" has been similarly defined in relation to section 4500 (*People* v. *Wells* (1949), 33 Cal.2d 330, 338 [202 P.2d 53]; *People* v. *Silva* (1953), 41 Cal.2d 778, 782 [264 P.2d 27]), and there can be no doubt as to its established meaning.

Likewise without merit is defendant's claim that there was no evidence that at the time of the commission of the assault he was undergoing a life sentence. The official custodian of the records at Soledad State Prison testified, without objection, that defendant was serving a life sentence. (*Cf. People* v. *Wells, supra*, 33 Cal.2d 330, 338, where testimony of the record clerk of Folsom State Prison that the defendant was carried on the prison roll as a "life termer" was sufficient to justify the grand jury's return of an indict-

ment.) Moreover, in recounting the attack and the morning's events to the prison officials in the captain's office, defendant stated: "I'm serving a life sentence." Also, there was introduced in evidence a certified copy of defendant's conviction of murder, upon which the life imprisonment term was based. Under the circumstances, there can be no question as to defendant's status as a person undergoing a life sentence.

■ Defendant argues that it was improper to admit evidence of Nelson's death as the result of the assault. The allegedly objectionable evidence was the testimony of the autopsy surgeon concerning his pathological findings when he examined Nelson the next day, and his statement that cerebral hemorrhage was the cause of death. Defendant urges that such testimony was wholly unnecessary in view of his having admitted that he had committed the assault, and that it only served to prejudice him in the eyes of the jury. Disregarding defendant's failure to make more than a general objection to this evidence (*People* v. *Nelson,* 85 Cal. 421, 428 [24 P. 1006] ; *People* v. *Sellas,* 114 Cal.App. 367, 378 [300 P. 150] ; *People* v. *Agajanian,* 97 Cal.App.2d 399, 405 [218 P.2d 114] ; *People* v. *Simon,* 107 Cal.App.2d 105, 119 [236 P.2d 855] ), the challenged evidence was relevant. Although defendant had admitted commission of the assault, he still maintained that he had not acted with malice aforethought. The pathological findings of the autopsy surgeon and his opinion as to the cause of death were relevant in the determination of the amount of force used and, consequently, of defendant's mental attitude at the time of the assault, and could not rightly be excluded merely because such "showing [of] the details of the crime . . . might have a tendency to influence the jury against the defendant." (*People* v. *Silva, supra,* 41 Cal.2d 778, 782-783.)

■ Nor did the trial court err in its instructions on the element of malice. In addition to giving the accepted meaning of "malice aforethought" as denoting "*purpose* and *design* in contradistinction to accident and mischance" (*People* v. *McNabb, supra,* 3 Cal.2d 441, 456 ; *People* v. *Wells, supra,* 33 Cal.2d 330, 338), the court also gave the statutory definition of the word "malice" as importing a "wish to vex, annoy or injure another person, or an intent to do a wrongful act." (Pen. Code, § 7, subd. 4.) Both terms as defined were properly submitted to the jury for the determination of defendant's guilt under Penal Code, section 4500. (*People* v. *Silva, supra,* 41 Cal.2d 778, 782.) But even if it were deemed

inappropriate to give the general definition of "malice" as distinguished from the essential element of "malice aforethought," it would not be prejudicial. (*People* v. *Waysman,* 1 Cal.App. 246, 248 [81 P. 1087].) It was so held in a prosecution for murder when the jury was given both the general statutory definition of malice (Pen. Code. § 7, subd. 4) and also its precise meaning "in the language of section 188 of the Penal Code." (*People* v. *Chavez,* 37 Cal.2d 656, 667 [234 P.2d 632].)

■ Turning now to defendant's claims with respect to the order denying his motion for a new trial on his plea of not guilty by reason of insanity, defendant first argues that his rights under Penal Code, section 1027, were not protected. That section requires the court-appointed alienists "to examine the defendant and investigate his sanity, and to testify, whenever summoned, in any proceeding in which the sanity of the defendant is in question." The record shows that two alienists were appointed by the trial court, and each thoroughly examined defendant. The separate examinations were made from four to six weeks following the assault, and each lasted about two hours.. Both doctors examined the psychiatric file on defendant. In the light of their examinations and their investigation of defendant's background, the doctors testified that in their opinion defendant was legally sane at the time of his commission of the assault. The doctors were fully cross-examined by counsel for defendant. Defendant argues that the doctors did not take into consideration his so-called objective symptoms at the time of the assault— his glassy stare and jerking of his head. He therefore claims that their opinions as to his sanity might be creditable as of the time of their examination but not as of the earlier date of the attack. However, defendant made no such objection at the trial as to the qualifications of these doctors to testify. The objection comes too late now for consideration on appeal. (*People* v. *Woods,* 19 Cal.App.2d 556, 560 [65 P.2d 940]; *People* v. *Messerly,* 46 Cal.App.2d 718, 722 [116 P.2d 781].)

■ Moreover, in effect, defendant is dealing only with the weight to be accorded to the medical expert testimony, which, of course, is a question of fact for the jury's determination. (See *People* v. *Martin,* 87 Cal.App.2d 581, 584 [197 P.2d 379].)

■ Defendant next contends that the trial court gave confusing instructions to the jury on the sanity issue. The jury was instructed that defendant was presumed sane, and

that he had the burden of proving his insanity at the time of the assault. There was evidence that defendant was suffering from schizophrenia some months before the assault. Accordingly, the court instructed that a condition once shown to have existed is presumed to continue until the contrary is proved; and therefore if the jury should find that at some time prior to the commission of the assault, defendant was suffering from some form of insanity, then it would be presumed that he was suffering from such form of insanity when he committed the assault. Considering these instructions on the sanity issue as a whole in the light of the record (*People* v. *Chessman*, 38 Cal.2d 166, 182-183 [238 P.2d 1001]; *People* v. *Hess*, 104 Cal.App.2d 642, 684 [234 P.2d 65]) and reasonably interpreting them as complementing one another (*People* v. *Rhoades*, 93 Cal.App.2d 448, 451 [209 P.2d 33]), it is clear that they properly stated the applicable law and furnish no basis for assuming that the jury was caused any confusion thereby.

Defendant finally contends that the long-established legal standard of sanity based on the knowledge of "right and wrong" should be reexamined. The recognized test is whether at the time the offense was committed the defendant was suffering such "a defect of reason, from disease of the mind . . . as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong." (*People* v. *Wells, supra,* 33 Cal.2d 330, 350.) The doctors who testified here were thoroughly examined on this accepted theory of insanity, and all agreed that defendant was sane at the time of the assault. Defendant stresses various matters in his psychopathic case history and his background of treatment. He suggests that in the light of these factors, the prime question should be whether he was a man responsible for his actions at the time, and not whether he knew the difference between right and wrong when he committed the assault. However, regardless of the doubtful merit of defendant's suggestion as a generally workable test, if any change is to be made in the accepted standard for determining criminal guilt in relation to the insanity plea, the arguments for such change should be addressed to the Legislature rather than to the courts. (*People* v. *Daugherty,* 40 Cal.2d 876, 893-894 [256 P.2d 911].)

The judgment and orders appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.