[Crim. No. 10070. In Bank. Feb. 16, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ARMANDO SANCHEZ, Defendant and Appellant.

Gerald Canaday, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Karl S. Mayer, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—A jury found defendant guilty of violation of Penal Code section 4500 (assault with deadly weapon by an inmate of a state prison undergoing a life sentence)[1] which under the circumstances of the instant case required the imposition of the death penalty. The court denied defendant's motion for a new trial and entered judgment on the verdict. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On April 23, 1965, defendant, an inmate at the state prison at San Quentin undergoing a life sentence, was assigned to work under the supervision of Ralph Canning in the prison clothing factory. Canning and Chester Malin were civilian foremen in the factory; Stanford Raymond, not present on the day in question, was superintendent. No correctional officers were assigned to the factory area.

During the noon lunch period Canning and Malin were eating together in the superintendent's office enclosure within the factory. Defendant while on his way to lunch learned from another inmate that Canning intended to write a report about defendant's involvement in a sex complaint. Upset by this information and unable to eat his lunch, defendant returned to the clothing factory and entered the superinten-

---

[1] Section 4500, as in effect at the time of the offense, provided in pertinent part: ''Every person undergoing a life sentence in a state prison of this State, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death; provided, however, in cases in which the person subjected to such assault does not die within a year and a day after such assault and as a proximate result thereof, the punishment shall be death or imprisonment in the state prison for life without possibility of parole for nine years, at the discretion of the court or jury trying the same, . . .''

dent's office to discuss the matter with Canning in Malin's presence. In the ensuing discussion, defendant denied complicity in any sex offense, while Canning insisted that it was nevertheless his duty to report the matter. During the conversation defendant seemed ''very irritated.'' Canning refused to discuss the matter further during the lunch hour and defendant eventually returned to his assigned station in the factory. Defendant testified that when he commenced work at his machine he could not concentrate on the job. He made a cup of coffee, but could not concentrate on drinking it. While returning his cup to its place in a drawer, he found a knife there.

About 2 p.m. Malin was asked by another inmate to inspect a machine which was claimed to be malfunctioning. After testing it for a few minutes, Malin looked up to notice inmates gathered in the vicinity of the superintendent's office. Upon investigation he found Canning's body lying face down on the office floor. Defendant was standing 35-40 feet away with blood on his clothing. An autopsy subsequently revealed that Canning had suffered 16 stab wounds in the area between his upper chest and upper thighs, varying in depth up to three inches. Two of the wounds punctured the heart, causing death.

Sergeant Beighley, a correctional officer, was called and arrived within a few minutes. The officer, upon seeing the body, asked, ''Who did this?'' Malin pointed to defendant, who was standing nearby. Beighley did not know defendant and had no recollection of having seen him before. He walked up to defendant who thereupon surrendered the knife. Beighley dropped it on the floor, placed his foot on it, and proceeded to search defendant for other weapons. He noticed that defendant's clothing was covered with blood. As he was searching defendant, Beighley inquired, ''Why did you do it?'' Defendant replied, ''He was going to give me a sex beef.'' Beighley rejoined: ''You have got something worse than a sex beef now.''

The other inmates then left the clothing factory. As they were checked out, Malin observed each one but saw no one with blood on his clothing.

About 2:30 p.m. defendant was brought to the captain of the prison's correctional officers, Captain Hocker, to be interrogated. The latter advised defendant that he had a right to remain silent and not answer any questions, that he had a right to an attorney if he so desired, and that anything he

said could be used against him. Defendant nevertheless chose to tell Captain Hocker what had happened. He stated that some time after his first talk with Canning he armed himself with a weapon and again attempted, unsuccessfully, to discuss the matter of the report Canning proposed to make. He then stated that he commenced to stab his victim. The foregoing conversation was not recorded.

There was evidence that before being brought to Captain Hocker's office defendant was taken to the adjustment center and that he was physically abused there. Defendant, who claimed that he "blacked out" when he came upon the knife in the drawer and remained in that condition until he recovered his senses in a cell at the adjustment center after the killing, testified that he was then and there beaten and kicked by four correctional officers. He stated that he received some "cuts" and "bumps" and "had a lot of bruises on my arms and on my back and legs"; that when he was taken from the cell to Captain Hocker he was naked, his blood-stained clothing having been removed; and that he was given a towel to put on his face. The record is not clear as to when he was given fresh clothing. A medical technician employed by the prison's hospital, called as a witness by defendant, testified that defendant had cuts in and below his left eyebrow, a swollen and cut nose and a cut on his left thumb. Seven stitches were required to be taken.

Between 3 and 3:30 p.m. a deputy district attorney accompanied by a stenographic reporter interrogated defendant. Upon being advised again of his constitutional rights, defendant requested the assistance of counsel, and an unsuccessful attempt was made to obtain one. The record fails to disclose what, if any, further conversations took place at that time.

On the following day Captain Hocker and a Lieutenant Moody approached defendant and advised him of his rights to remain silent and to an attorney and cautioned that anything he said could be used against him. Defendant did not request an attorney and made statements at this interrogation which are consistent with those he made earlier in Captain Hocker's office.

Defendant took the stand to testify in his own behalf. He stated that after seeing the knife in the drawer as he was returning his coffee cup he blacked out and that he remembered nothing until he regained consciousness in the adjustment center shortly before his first interview with Captain

Hocker.[2] He testified further that he had a similar experience in 1958 when he assaulted an inmate. He was impeached to some extent, however, when he admitted on cross-examination that during the trial for the earlier assault he had described that attack in detail and when an investigating officer testified that defendant had related details of the prior attack to him soon after it occurred.

Defendant contends that there is insufficient evidence to establish that he acted with malice aforethought. ██ It is settled that malice aforethought is an essential element of the crime stated in section 4500. (*People* v. *Silva* (1953) 41 Cal.2d 778, 782 [264 P.2d 27] ; see *People* v. *Wells* (1949) 33 Cal.2d 330, 337 [202 P.2d 53].) ██ As used in that section the term denotes "*purpose* and *design* in contradistinction to accident and mischance." (*People* v. *McNabb* (1935) 3 Cal.2d 441, 456 [45 P.2d 334] ; see also *People* v. *Berry* (1955) 44 Cal.2d 426, 430 [282 P.2d 861] ; *People* v. *Wells, supra,* 33 Cal.2d 330, 338.) "Malice," as therein employed, is said to import, in the words of subdivision 4 of Penal Code section 7, "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law" (*People* v. *Silva, supra,* 41 Cal.2d 778, 782), and the instant meaning of "malice aforethought" is not to be distinguished from that which, now and prior to the enactment of section 4500 and its predecessor,[3] differentiates murder from manslaughter.[4] (See *People* v. *Superior Court* (1953) 118 Cal.App.2d 700, 703 [258 P.2d 1087] ; see also *People* v. *Wells, supra,* 33 Cal.2d 330, 338.)

In connection with the crime of murder as "the unlawful killing of a human being, *with malice aforethought*" (Pen. Code, § 187, italics added), the term is given definition in Penal Code section 188 in the following language: "Such malice may be express or implied. It is expressed when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable

---

[2]The court instructed the jury substantially in the language of CALJIC No. 73 (defendant presumed sane at time of act), No. 71-C (unconscious act not criminal) and No. 71-D (burden of proof as to unconsciousness).

[3]Section 4500, enacted in 1941 (Stats. 1941, ch. 106, p. 1124, § 15), was derived from former Penal Code section 246 (Stats. 1901, ch. 12, p. 6, § 1).

[4]Section 187 of the Penal Code, providing that murder "is the unlawful killing of a human being with malice aforethought," was enacted in 1872.

provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

■ As the above code provisions indicate, malice aforethought may be presumed from the circumstances attendant to the commission of an act. Thus in *People* v. *Conley* (1966) 64 Cal.2d 310, 320 [41 Cal.Rptr. 815, 411 P.2d 911], involving a charge of murder, we said: "These provisions create a presumption of malice when the commission of a homicide by the defendant has been proved and place the burden on him to raise a reasonable doubt in the minds of the jurors that malice was present."

■ In the instant case, in addition to the fact of the killing by defendant, there is other substantial evidence that defendant had a serious grievance with Canning, that Canning's threatened report was of major significance to defendant, and that defendant was angry with and antagonistic toward Canning. He admitted that he had attacked Canning because "he was going to give me a sex beef." Defendant seeks to overcome the foregoing with claims that he had had no prior difficulties with his victim, and that his low intellectual level, the nature of the wounds inflicted and certain psychiatric testimony required a determination that he could not have acted with malice aforethought.

To the extent that defendant's claims tend to establish that he bore no ill will toward his victim, they are unavailing. "An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. . . . An awareness of the obligation to act within the general body of laws regulating society, however, is included in the statutory definition of implied malice. . . ." (*People* v. *Conley, supra,* 64 Cal.2d 310, 322.)

Defendant makes the further contention that he was mentally incapable of malicious conduct.[5] There was expert psychiatric testimony both in support of and in opposition to his claims of mental incapacity. Dr. Pouteau testified that it

---

[5]Defendant initially pleaded not guilty and not guilty by reason of insanity. The court thereupon appointed two doctors to examine defendant in accordance with Penal Code sections 1027, 1368 and 1369. After the verdict was rendered and recorded, defendant's plea of not guilty by reason of insanity was withdrawn and the cause was continued for arraignment for judgment. Defendant urges no irregularity in connection with the withdrawal of the plea.

was his conclusion that defendant's act was impulsive, without a consciousness of a specific intent to kill, and he described the assault as having taken place during a brief period of dissociative conduct. On cross-examination he conceded, however, that defendant was capable of formulating and carrying out a plan to commit a homicide. He testified further that his conclusion of dissociative conduct was based in part on past history of a similar experience suffered by defendant, and that such conclusion would be placed in some doubt had he been aware that defendant actually remembered the details of the earlier attack and could recount within the hour (i.e., to Captain Hocker) what had taken place on the instant occasion. On the other hand, Dr. Byledbal, a psychiatrist called by the prosecution, testified that defendant had the capacity to formulate and carry out a planned assault, that the attack was not carried out during a period of dissociation, and that defendant suffered from no mental infirmities.

An implied finding of malice aforethought, like any other factual determination, must be sustained where there is substantial evidence from which a jury could reasonably have concluded that such malice was present. (*People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) At best defendant has only raised a conflict in the evidence going to the question of malice aforethought. The weight to be given to the testimony of the medical experts was clearly a matter for the jury to determine. (See *People* v. *Berry, supra,* 44 Cal.2d 426, 432.)

Defendant contends that the admission in evidence of the statement made by him to Sergeant Beighley immediately after the latter's arrival on the scene constitutes reversible error under the rules announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Since the instant trial was had before June 13, 1966, the date of the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], we properly apply *Escobedo* and *Dorado* to the problem at hand, and refrain from applying *Miranda*. (*People* v. *Rollins* (1967) *ante,* p. 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

We have already set forth herein the pertinent facts. It is sufficient to note at this point that when Beighley came upon the scene of the killing he found defendant standing nearby with the knife in his hand and blood on his clothing.

In response to the officer's inquiry, defendant stated: "He was going to give me a sex beef." This answer not only stated a reason for the killing but also constituted an implied admission that the act had been accomplished by defendant. The statement was obviously incriminating.

We have said on a number of occasions that under the principles announced in *Escobedo* and applied in *Dorado,* the accusatory stage, or that stage when the suspect is entitled to counsel, has been reached when the investigation has begun to focus on the suspect, the suspect is in custody and the police have undertaken a process of interrogations that lends itself to eliciting incriminating statements. (*People* v. *Forbs* (1965) 62 Cal.2d 847, 850-851 [44 Cal.Rptr. 753, 402 P.2d 825]; *People* v. *Bostick* (1965) 62 Cal.2d 820, 834 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 761 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97], affd. *California* v. *Stewart* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; *People* v. *Dorado, supra,* 62 Cal.2d 338, 349.)

The People argue that in the light of the above circumstances the accusatory stage had not commenced for the reasons that the investigation had not yet begun to focus on defendant as a particular suspect and defendant was not yet in custody within the meaning of the rule. It is not necessary that such contentions be resolved, however, because it clearly appears that the authorities had not, at that time, embarked upon a process of interrogations that lent itself to eliciting incriminating statements. ▮▮ To determine whether such a process of interrogations has been undertaken, we must apply an objective test and "analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People* v. *Stewart, supra,* 62 Cal.2d at p. 579.)

Applying the foregoing test, we observe at the outset that the question provoking the statement involved was asked by Beighley almost immediately after his appearance at the scene. He had been summoned because of "trouble" in the clothing factory and his apparent purpose was to find out what it was and take measures to meet it. Upon arrival he made a general inquiry as to "Who did this?" and after defendant had been pointed out, secured the knife, as we have already related, and during the ensuing search asked defend-

ant "Why did you do it?" This episode, embracing but two questions, occupied an almost miniscule time period. Under the circumstances, the two questions appear to be investigatory rather than accusatory in nature. It is also noteworthy that while defendant was in custody in the general sense in which all prisoners are deemed to be in custody, he was not yet in custody for the particular offense. The atmosphere in which he spoke was not one removed from the place of the offense or dominated by custodial officers. Beighley was the lone correctional officer confronting defendant and as numerous other inmates stood nearby he disarmed, apprehended and searched defendant. A fair reading of the record indicates that his primary, if not sole, concern was the apprehension rather than the interrogation of defendant. In the light of the criteria set forth in *Stewart* we conclude that a process of interrogation had not been undertaken at the time defendant's statement was made. (See *People* v. *Treloar* (1966) 64 Cal.2d 141, 146-147 [49 Cal.Rptr. 100, 410 P.2d 620]; *People* v. *Cotter* (1965) 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862].)

We now turn to defendant's next statement made in Captain Hocker's office approximately a half hour later and clearly constituting a confession of the crime. It is manifest that it was the result of a process of interrogation. Defendant launches a two-fold attack against its admission in evidence claiming, first, that the confession was involuntary and, secondly, that even assuming that it was voluntary and that defendant had been advised of his constitutional rights in accordance with *Escobedo* and *Dorado,* nevertheless because of his then physical condition he was unable to make an intelligent waiver of his rights to counsel and to remain silent.[6]

As previously stated, in the half-hour period between his apprehension and appearance before Captain Hocker, defendant was subjected to some abuse by correctional officers. He had cuts on his face and a swollen and bleeding nose when he appeared in the office. We also pointed out that the captain advised defendant of his constitutional rights in the manner required by *Dorado.* The fact of such advice was testified to by both the captain and defendant, and defendant, in electing to tell the captain what had happened in the clothing factory, must be deemed to have made an intelligent waiver of his rights to remain silent and to counsel. In this connection

[6]Defendant does not claim error in the admission of his statements made to Captain Hocker and Lieutenant Moody on the following day.

defendant personally testified on *voir dire* prior to the captain's testimony that he understood the warnings; that he knew he had the right to an attorney and the right to remain silent if he chose to do so; that he knew what he might say could be used against him, but that he told Captain Hocker he wanted to talk about what happened in the clothing factory. He further testified that he told the captain the truth of what happened, and that the captain made no promises or threats which tended to induce the statements he made to the captain. Significant is defendant's following testimony on *voir dire*: "Captain Hocker asked me about my civil rights, that if I wanted to remain silent until I got an attorney, and I told him I would like to tell him what had happened to Mr. Canning and he told me I didn't have to tell him and that I could remain silent, and I said 'want to tell you'. . . ."

■ An accused's rights to counsel and to remain silent may be waived if he knows of his rights and intelligently and knowingly elects to waive them. (See *Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490; *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357]; *People* v. *Buchanan* (1966) 63 Cal.2d 880, 886-887 [48 Cal.Rptr. 733, 409 P.2d 957]; *In re Johnson* (1965) 62 Cal.2d 325, 334-335 [42 Cal.Rptr. 228, 398 P.2d 420].) ■ Defendant's claim that his confession was involuntary and his claim that he made no intelligent waiver of his constitutional rights can be supported only on the ground that he had received a beating shortly before his confession to Captain Hocker.[7] (See *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205].) The contentions are intertwined and must stand or fall together.

We are distressed and disturbed that prison officials are incapable of controlling the reprehensible conduct of correctional officers which the instant record discloses. If the record further disclosed that the mistreatment of defendant in any manner induced the confession which he made to Captain

---

[7]This was the position of defendant's counsel at trial who, upon conclusion of the *voir dire* examination, objected to the admission of the confession because "this beating occurred only minutes before he talked to Capt. Hocker. . . ." Overruling the objection, the trial judge observed: "It doesn't appear that if any such beating were given there was any such results. MR. DURHAM [Counsel for Defendant]: That is only human nature, the only conclusion that could be reached. MR. SHAW [Prosecutor]: Mr. Sanchez testified in great detail concerning his understanding of what was going on and the fact that he gave the story accurately and in its entirety as far as he was able to do so at the time and Capt. Hocker's testimony indicated that the man was able to understand and respond. I think there is no question about it."

Hocker, we would be compelled to reject the confession and impose upon the People the burden of a new trial. Without in any manner approving the conduct of the prison officials, however, we are unable to discern from the record that there is any connection between the beating and the confession. The captain testified that while defendant's wounds were visible he did not appear to be incapacitated in any manner, made no complaints, and suffered no apparent nausea. Defendant testified only that he was a "little bit dizzy" while in the captain's office. On the other hand his testimony on *voir dire*, heretofore set out, was clear and convincing to the effect that he fully understood his position and rights, and that he elected to make a statement for reasons not induced by nor dependent upon the claimed beating. Considering only those matters taking place in the captain's office, the voluntary nature of the confession appears as a matter of law, and the record fails to disclose that outside influences, whatever their nature, had any substantial bearing on the question. Although defendant had ample opportunity to testify that the mistreatment he suffered influenced his confession, if in fact it did, he did not so testify and his testimony otherwise generally rejected such a conclusion.

The trial court made an independent determination on the basis of conflicting evidence that the statement was voluntarily given in the manner required in *Jackson* v. *Denno*, *supra*, 378 U.S. 368. The jury heard the testimony on the question of voluntariness, as well as the confession itself, and was properly instructed that it could not consider the confession if it failed to make an independent determination that it was voluntarily given by defendant. ▇▇▇ In the absence of a clear abuse of discretion, the trial court's conclusion as to the voluntary nature of the confession will not be disturbed on appeal. (*People* v. *Kendrick* (1961) 56 Cal.2d 71, 87 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Mehaffey* (1948) 32 Cal.2d 535, 553-554 [197 P.2d 12]; cf. *People* v. *Underwood* (1964) 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937].) ▇▇▇ We cannot say that the instant record compels the rejection of defendant's confession as a matter of law. On the contrary, there is substantial evidence supporting the court's initial determination that it was voluntary (*People* v. *Kendrick*, *supra*) and under the circumstances the court was warranted in admitting the confession for the consideration of the jury who were properly instructed to disregard it, if they found it to be involuntary.

For the same reason we conclude that the trial court properly determined that defendant made a knowing and intelligent waiver of his rights to counsel and to remain silent. However, defendant urges that, having determined that defendant had been properly advised as to his constitutional rights by Captain Hocker, the court should have instructed the jury that they also must determine that such advice had been properly given before they should consider the confession. Outside the presence of the jury the trial judge stated to counsel that he was not aware of any requirement for such an instruction to the jury, although he was aware that where the objection to a confession was one of voluntariness the jury, as well as the judge, was required to make an independent determination. As heretofore appears, the court instructed the jury as to its duty to determine the voluntary nature of the confession made to Captain Hocker, but gave no parallel instruction going to the question of the rights to counsel and to remain silent.

In *People* v. *Schader* (1965) 62 Cal.2d 716, 727-728 [44 Cal.Rptr. 193, 401 P.2d 665], we deplored the situation which may develop in the case of a confession obtained in derogation of the right to counsel where interrelated issues of whether an accused requested and was denied counsel, whether he was advised of his rights and whether he waived those rights are submitted to the jury without prior determinations by the court as to such matters affecting a confession. But we did not, as defendant apparently contends, require that the jury be instructed to make an independent determination of these matters prior to considering an extrajudicial statement.

At the time of the trial of the instant cause California was one of several states requiring, without federal constitutional compulsion (see *Jackson* v. *Denno, supra,* 378 U.S. 368), an independent determination of the voluntariness of an admission by both the trial judge and jury. (*People* v. *Bevins* (1960) 54 Cal.2d 71, 76-77 [4 Cal.Rptr. 504, 351 P.2d 776].)[8] It does not necessarily follow that a similar rule should obtain as to the rights to counsel and to remain silent before allowing jury consideration of an extrajudicial statement. The matters which must necessarily be placed before the jury in such an instance are not of the same nature as those which are presented to a jury on the question of voluntariness. (See

---

[8]We express no opinion as to the procedure to be followed under the new Evidence Code effective January 1, 1967. (See Evid. Code, § 405; Witkin, Cal. Evidence (2d ed. 1966) §§ 492, 1092.)

*People* v. *Gorg* (1955) 45 Cal.2d 776 [291 P.2d 469].) Moreover, the determination which must be made is a more complex one than in the case of a question of voluntariness.

■ Finally, in the particular circumstances of the instant case, the jury, in determining the question of voluntariness, necessarily foreclosed any question of a lack of waiver, as such a lack could only be found where defendant had involuntarily confessed. Accordingly, no good purpose would have been served in the instant case by instructing the jury in the manner defendant claims was required.

■ Defendant next complains that the trial court erred prejudicially in admitting, over objections, three photographs showing stab wounds on the victim's body. The photographs were of probative value in that they served to identify the victim, clarify and illustrate the autopsy surgeon's testimony, and to illustrate the nature of the attack made on the victim in a situation where malice was an issue. (*People* v. *Harrison* (1963) 59 Cal.2d 622, 628 [30 Cal.Rptr. 841, 381 P.2d 665].) No claim is made that the photographs were introduced in an untimely manner, were unreasonably displayed, or unduly sensational. In such circumstances, "Whether the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion." (*People* v. *Harrison, supra,* at p. 627; see also *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) No sufficient showing is made that the trial court abused its discretion.

■ Finally defendant contends that the prosecutor committed prejudicial misconduct during his closing argument to the jury. The incident complained of occurred in the course of comments upon the testimony of Dr. Byledbal, a psychiatrist appointed by the court before trial to examine defendant and called by the prosecution as a witness in rebuttal. After summarizing the opinion evidence given by the witness in reference to defendant's asserted inability to remember the killing, the prosecutor argued that according to such testimony "this is not an amnesia that occurred at the time of the event, but something that occurred after, something that occurred because he would rather not remember it because it is an unpleasant thing. Ladies and gentlemen, if a statement by a defendant who just kills another to the doctor that he doesn't remember the event *is enough to provide a*

*defense here,* then there is no correctional officer and there is no person working as a free man at San Quentin who can be safe in his job.'' (Italics added.) Over defense counsel's objection, the prosecutor was allowed to continue, and he then advised the jurors that ''the purpose of the law we have on the books concerning these events'' was to avoid the endangering of the lives of civilian prison personnel. Defendant now claims that the prosecutor misstated the purpose of section 4500 and by his remarks implied that the statute was intended to eliminate an honest defense based on lack of memory. We find no merit in the claim.

It has been said that the statute ''was enacted as a disciplinary regulation and as a means of protection to prisoners themselves against the assaults of the vicious, and also to protect the officers who are required to mingle with the inmates, unarmed.'' (*People* v. *McNabb, supra,* 3 Cal.2d 441, 458; see also *In re Quinn* (1945) 25 Cal.2d 799, 802 [154 P.2d 875].) Other free men working within the prison clearly fall within the protective ambit of the section. It would seem, therefore that the prosecutor's remarks in respect to the purpose of the statute were substantially correct. Furthermore, a fair reading of the transcript discloses that the prosecutor did not advise the jury that a defense based on lack of memory was negated by the statute but merely that such defense was not tenable in the instant case in the light of the evidence and the testimony of the psychiatrist. Finally, we observe that, although defense counsel objected, he did not request the trial court to advise the jury as to the applicable law or to instruct them to disregard the prosecutor's remarks and that defendant cannot now complain of the alleged misconduct on appeal. (*People* v. *Ney* (1965) 238 Cal.App.2d 785, 790-791 [48 Cal.Rptr. 265].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.