[Crim. No. 12539.   Second Dist., Div. One.   Feb. 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM DAVID ANGELL et al., Defendants and Appellants.

814

Richard P. B. Tyson and Charles Hollopeter, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendants Baldwin and Angell were convicted of first degree robbery (§ 211, Pen. Code) and first degree murder (§ 187, Pen. Code) ; they appeal from the judgments.

Around 9:20 p.m. on February 24, 1965, Russell Poto, a clerk in the Silverlake Liquor Store, was found lying unconscious with a gunshot wound in his head behind the counter near the cash register by Sergeant Gorence, off duty, who had entered the store to buy milk; shortly thereafter Poto died. On the floor near the ice box was a spent .22 caliber cartridge case (Exh. 17). The cash register was open and empty; $334 had been taken. Officer Wolfer, a ballistic expert, testified that he examined the .22 caliber shell (Exh. 17) found on the floor of the liquor store and a .22 caliber sawed-off rifle (Exh. 11) found in a suitcase in Angell's apartment, and has ''abso-

lutely'' no doubt that the shell had been fired from the sawed-off .22 rifle. Admitted in evidence was Angell's written confession that he and Baldwin committed the robbery which resulted in the shooting, and Baldwin's oral admission that he was implicated in the holdup and murder. Neither defendant took the stand in his defense.

Appellants urge that there was no probable cause for and no exigent circumstances justifying Baldwin's arrest thus the arrest, subsequent search of the apartment and seizure of articles found therein were unlawful.  ██  ''The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the Officers at the time the arrest was made.'' (*People* v. *Talley*, 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564]; *People* v. *Privett*, 55 Cal.2d 698, 701 [12 Cal.Rptr. 874, 361 P.2d 602]; *People* v. *Lara*, 67 Cal.2d 365, 373-374 [62 Cal.Rptr. 586, 432 P.2d 202].) The following was offered on the issue of probable cause.

Around 9 p.m. on March 2, 1965, Officer Joncich, Call No. 44, Communications Division, received a call from a male who stated, ''I am going to say this one time. The boy that shot the clerk in the liquor store in Silverlake—in Silverlake is at 1811 Tamarind, apartment 201. He is taking a shower. He is getting ready to pull another job. You had better get him before he kills somebody else.'' Asked the boy's name, the caller replied, ''Richard Baldwin.'' Officer Joncich did not recall mention of a .22 caliber weapon or Baldwin's physical description but according to Lieutenant Newton, Homicide, Officer Joncich relayed to him, in addition to the above information, that Baldwin ''was a male Caucasion, tall and dark'' and ''had the .22 that he used on the holdup murder in the room with him.''

At 9:10 Lieutenant Sloan and Sergeant Buckland, Robbery, received all of the above information from Lieutenant Newton. Both officers had been at the scene of the Silverlake robbery on February 24, 1965, and had seen an empty .22 caliber casing (Exh. 17) on the floor near the body. Lieutenant Sloan, Sergeant Buckland and Officer Ferrone went to 1811 Tamarind. Upon arrival they checked the mail boxes and found that apartment 201 was registered to Angell. Sergeant Buckland talked to the landlady who knew of no ''Richard Baldwin'' living there; he asked for a description of Angell but the one she gave did not correspond with that given by Lieutenant Newton. Then Sergeant Buckland suggested that they ''go up to 201 and talk to whoever was at the apartment and see if

there was any reason that somebody would give us a phone call of this nature.''

Sergeant Buckland had his badge and ID in his left hand when he knocked on the door of apartment 201; immediately the door was opened by a man fitting the description of Baldwin who then stepped back. At that instant Sergeant Buckland viewed the inside of the apartment; he saw on a dresser against the wall a dark revolver and a pair of dark glasses, on the bed a chrome automatic handgun and on the floor some green jump wires with four clips. Sergeant Buckland said, ''Police officers''; Baldwin hesitated a second, ''then wheeled and started toward the gun that was on the dresser'' about 11 feet from the officer. Sergeant Buckland dropped his badge and ID and started after him, grabbing the back of Baldwin's coat, at the same time drawing his revolver. Sergeant Buckland gave him a quick search, arrested him for robbery and ''perhaps homicide'' and handcuffed him. Then he told Baldwin that it was his duty to inform him of his constitutional rights—that he did not have to make any statements, that he is entitled to have an attorney with him at all times and that if he did make any statement it may be used against him in any criminal proceedings arising out of the arrest. Sergeant Buckland then picked up the dark revolver on the dresser and checked it, found it empty and put it in his pocket, the glasses, the chrome automatic from the bed and removed the clip with seven rounds of ammunition, jump wires, a pair of gloves, some surgical tubing with clips on the end that he ''felt would be used to quickly tie a person with,'' a Union 76 map on which were some markings just below the Silver Lake Reservoir, near the location of the Silverlake Liquor Store, and a newspaper clipping of the shooting on Silverlake headlined ''Moonlighting Clerk Shot''; in the breakfast bar he found a suitcase in which was a sawed-off .22 rifle (Exh. 11). Meanwhile Officers Murphy and Rutert arrived and Sergeant Buckland related to them all of the conversation from the time Lieutenant Newton talked to him, all that had occurred at the Tamarind apartment, that he had arrested Baldwin for robbery murder, that Baldwin had an accomplice living there by the name of Angell who was registered to the apartment, and the description of Angell given to him by the landlady.

Officers Murphy and Rutert waited in the apartment about an hour and a half. Officer Murphy went down to the police car to radio in for any messages; he saw two men, one who appeared to match the description of Angell, walking on Tama-

rind. Five minutes later one of them (Perry) knocked on the door and asked if Angell was there; Officer Murphy ascertained from him that Angell was in a bar waiting for the officers to leave. He went to the Rhonda Bar where he arrested Angell and informed him of his constitutional rights—that anything he said might be held against him, that he had a right to an attorney and that he had a right to remain silent.

Time was of the essence when the officers went to the Tamarind address; they had information, although anonymous, that Baldwin, who had already killed one man and had in his possession the .22 he had used, was getting ready to pull another job and should be stopped before he killed somebody else. That a .22 had been used in the liquor store slaying was verified by the finding of an empty .22 caliber cartridge casing on the floor near Poto's body by Lieutenant Sloan. The situation confronting the officers indicated the need for swift action. They reasonably could have concluded from the telephone message not only that the subject of the call, having already committed one felony, was about to commit another, but that he could not be expected to remain stationary for long. (*People* v. *Sandoval,* 65 Cal.2d 303, 310 [54 Cal.Rptr. 123, 419 P.2d 187].) These circumstances permitted no delay and warranted the officers in going to the address to investigate further. While the anonymous information, even though in part verified by the officer's personal knowledge, may not have been sufficient alone to constitute probable cause for arrest, absent an emergency (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Reeves,* 61 Cal.2d 268, 273-274 [38 Cal.Rptr. 1, 391 P.2d 393]; *People* v. *Gallegos,* 62 Cal. 2d 176, 179 [41 Cal.Rptr. 590. 397 P.2d 174]; *People* v. *Davis,* 205 Cal.App.2d 517, 521 [23 Cal.Rptr. 152]), the fact is, contrary to that urged by appellants, that no arrest was made solely upon this information; nevertheless, it required the officers in the discharge of their duties to make an investigation. Actually, it would not have been unreasonable for them to go directly to apartment 201 to seek an interview with the suspect. (*People* v. *Michael,* 45 Cal.2d 751, 754 [290 P.2d 852].) Their investigation having failed to verify the information the officers had in their possession, they went to apartment 201 to see if there was any reason for someone to give the police a call of this nature.

The door was opened by a man who fit Baldwin's description. At this point Baldwin contends that the testimony is "sharply conflicting" and, on his own testimony that he made

818

no effort to escape and no "movements toward any gun" and was seized immediately after the door opened, argues that "there were no exigent circumstances justifying" his arrest.[1] ■ "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People* v. *Lyons*, 47 Cal.2d 311, 320 [303 P.2d 329]; *People* v. *Perez*, 65 Cal.2d 709, 712 [56 Cal.Rptr. 312, 423 P.2d 240]; *People* v. *White*, 43 Cal.2d 740, 747-748 [278 P.2d 9].) ■ It is readily apparent from the statement of the trial judge in ruling on the admissibility of the evidence that he wholly rejected Baldwin's version of what occurred and accepted that of Sergeant Buckland; further, conflict[2] existing in the testimony of the three officers was considered by him as insufficient to affect the credibility of Sergeant Buckland, stating that had the testimony of the three been alike it would have been suspect. Appellants urge a rejection of the trial court's finding on probable cause as based on testimony inherently improbable. Baldwin argues that it is not reasonable to believe that in the face of three drawn guns he would try to escape or move toward the gun. In answer to this, Sergeant Buckland, who faced Baldwin when the door opened, did not have a gun in his hand but drew it only after Baldwin made his move toward the gun on the dresser; and it is much more reasonable to believe that in the instant he saw Sergeant Buckland and the two officers behind him (who had drawn guns) and heard "Police officers," Baldwin, knowing he had killed a man and

[1]Baldwin testified on *voir dire* examination that when he heard the knock he turned the tumbler on the door and the door flew open; he saw a gun pointed at him; he did not turn his back on Sergeant Buckland but was forced backwards and immediately seized; a chrome pistol was lying on the edge of the table and on the top of the dresser was a brown box inside of which was a .22 caliber pistol and three boxes of ammunition; he made no movement toward the box and did not proceed in the direction of the gun on the table.

[2]Officer Ferrone, the last person in the room, testified that the door was opened by Baldwin, Baldwin rushed toward the back of the room, Sergeant Buckland took several steps, seized him and placed him under arrest; he saw a chrome automatic on the bed but the first time he saw the .22 black revolver was at the station. In his report he wrote that on the dresser was a brown box in which they later found a .22 revolver. Lieutenant Sloan the second officer in the apartment, testified that almost immediately after he entered he saw the black revolver on the top of the box on the dresser and the chrome colored automatic lying on the bed; as he and Officer Ferrone came through the door, Sergeant Buckland "grabbed the man and had ahold of him."

without time for reflection, instinctively turned either to escape or to get his gun.

Confronted with the information relayed to him by Lieutenant Newton, in part verified by his own knowledge that an empty .22 cartridge casing was on the floor near the victim of the liquor store robbery, and his personal observations of the man who opened the door and of the guns and other paraphernalia in the room behind him, Sergeant Buckland had reasonable cause to believe that the man "who wheeled and started toward the gun" on the dresser upon learning the three men were police officers, was Richard Baldwin who had committed the Silverlake Liquor Store holdup, killed one man, had with him the .22 he had used in the shooting and was about to "pull another job"; and that Baldwin was going for the gun to shoot it out with the officers. If this be not sufficient to require Sergenat Buckland's quick action to protect himself and his fellow officers, it is hard to conjure up a stronger case short of having the gun pointed directly at him. With Baldwin's unexpected conduct, Sergeant Buckland's opportunity for further investigation ceased and immediate action was required; under these circumstances the officer could not be expected to do other than make the arrest. (*People* v. *Schader*, 62 Cal.2d 716, 723 [44 Cal.Rptr. 193, 401 P.2d 665].) In *Schader*, the officer was advised by radio that another officer had been killed 15 minutes earlier and the two suspects were driving in a given direction; shortly thereafter he stopped a Cadillac with one passenger. The officer testified that the driver (Schader), because of his informal dress and youth, "did not fit" the Cadillac. Schader got out of the car and asked if he had done something wrong; the officer drew his gun and directed him to lie on the ground, then heard Schader shout a warning to Turner who was hiding in the rear of the Cadillac. Holding that the officer had ample reason to stop the vehicle and arrest the occupants, the court said at page 723: "With the information that one police officer had already been slain, however, Officer Morris was under no compulsion to investigate further before making the arrest. His immediate duty was to arrest the driver of the suspect vehicle, disarm him of any weapons, with a minimum of risk to his own personal safety, and proceed with his investigation." Again at pages 724-725: "Officer Morris was entitled to protect himself from the dangers that befell Officer McKnight; thus the officer while conducting the investigation had the right to arrest defendant. Under such circumstances as faced this officer, society must risk the ar-

rest of suspects who are innocent rather than subject officers to needless hazards in effecting the arrest of suspected armed murderers.'' Thus, apart from any issue of probable cause, the quick suspicious action of Baldwin upon learning that those standing on his threshold were police officers, created a situation entitling Sergeant Buckland to protect himself from the danger that befell Russell Poto.

However, it appears from the trial judge's lengthy statement that he also concluded that Sergeant Buckland had reasonable cause to arrest Baldwin; there is ample evidence to support his conclusion. (*People* v. *Talley,* 65 Cal.2d 830, 837 [56 Cal.Rptr. 492, 423 P.2d 564].) Confronted with his own personal knowledge and observations corroborating the anonymous information received by him through official channels (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Davis,* 205 Cal.App.2d 517, 521 [23 Cal.Rptr. 152]), and the suspicious conduct of Baldwin further substantiating the information (*People* v. *Melchor,* 237 Cal.App.2d 685, 693 [47 Cal.Rptr. 235]; *People* v. *Currier,* 232 Cal.App.2d 103, 107 [42 Cal.Rptr. 562]; *People* v. *Landry,* 230 Cal.App.2d 775, 780 [41 Cal.Rptr. 202]), Sergeant Buckland at the moment of arrest had reasonable cause to believe that Baldwin had robbed the liquor store and shot the clerk (*People* v. *Schader,* 62 Cal. 2d 716, 722 [44 Cal.Rptr. 193, 401 P.2d 665]); the information received from the anonymous call was sufficiently corroborated so that reliance thereon was reasonable. (*People* v. *Talley,* 65 Cal.2d 830, 836 [56 Cal.Rptr. 492, 423 P.2d 564].)

Thus, the subsequent search of Angell's apartment and seizure of guns and other effects found therein were clearly incident to the arrest and hence not ''unreasonable'' within the meaning of the Fourth Amendment. (*People* v. *Webb,* 66 Cal.2d 107, 111-112 [56 Cal.Rptr. 902, 424 P.2d 342]; *People* v. *Lara,* 67 Cal.2d 365, 373 [62 Cal.Rptr. 586, 432 P.2d 202].) This also disposes of Baldwin's further contention that his oral admissions were inadmissible as the product of an unlawful arrest, search and seizure.

Baldwin was arrested around 10 p.m. on March 2, 1965, and advised by Sergeant Buckland of his constitutional rights; several hours later Angell was arrested and advised of his constitutional rights by Officer Murphy. No statements were made by defendants at that time.

The following day (March 3, 1965) at 10:50 a.m., Sergeants Henry and Vietti interviewed Angell; the tape was received in evidence (Exh. 18-A). At the outset Sergeant Vietti told An-

gell that he did not have to tell the officers anything, had a right to remain silent, anything he said could be used against him in a court of law and he had a right to an attorney at any time; asked if he understood this, Angell replied that he did. Angell said he had served 18 months in prison for a violation of the Dyer Act; in his apartment at 1811 North Tamarind were a black .22 caliber pistol, an old antique rifle, a .32 automatic and Baldwin's .22 caliber rifle which Baldwin sawed off in the apartment; Baldwin told him that he (Baldwin) and someone else had been on a liquor store robbery on February 24, 1965, on Silverlake in which a man was shot in the head with a .22, and the ''other guy shot him''; he (Angell) ''wasn't there''; that night Baldwin carried the rifle in a suitcase to his apartment and wanted to throw away the rifle; Baldwin had a newspaper clipping about the shooting; he (Angell) definitely ''wasn't in on it,'' was not with Baldwin when he held up the liquor store and was willing to face Baldwin and tell him he was lying if he stated otherwise; and it was he who called the police on March 2 at 10 minutes to 9 and said that Baldwin was in his apartment, had been on the liquor store robbery, was ready to go out again and rob somebody with the .22 and should be stopped before somebody else got killed.

Following this, around 11:25 a.m., the officers talked to Baldwin; Sergeant Vietti told him ''like they told you last night—but I want to tell you again that you can have an attorney any time you want and you can remain silent—don't have to tell us anything. And if you tell us anything it can be used against you in a trial, understand that?''; Baldwin replied affirmatively. Baldwin said he had served time for a violation of the Dyer Act and one escape; he denied knowing anything about the liquor store robbery on Silverlake on February 24, 1965, ever being in the liquor store, ever telling Angell he had been in the liquor store, and ever being on any robberies in Los Angeles with Angell. He said if Angell told them he had admitted that he shot a man in the Silverlake Liquor Store he was ''crazy'' and lying. Then the officers brought in Angell and in Baldwin's presence asked Angell to repeat what had occurred the night of the Silverlake robbery. Angell said that Baldwin came to his apartment with a suitcase containing a rifle, told him he had been on a robbery in Silverlake with another person and the other person shot the clerk in the liquor store; that the sawed-off .22 rifle belonged to Baldwin. At this point Baldwin admitted ownership of the .22 rifle and that he sawed it off, but denied telling Angell about

any shooting. The officer encouraged Baldwin to get the matter off his chest if he was involved in the robbery; then Baldwin said, "I didn't even know he was going to fire a shot until I heard it"; the fellow with him was a man named John who asked him if he wanted to make some easy money, John used his (Baldwin's) sawed-off .22 rifle, he went to the liquor store and sat in his car where he heard a gun go off, John got in the car saying, "Let's go," and gave him $30; he had known John only a couple of days and let him off at Hollywood and Vine; John said he was leaving town. The entire interview with Baldwin and then with Angell in Baldwin's presence was taped and received in evidence (Exh. 19-A).

Of the following the trial judge ruled inadmissible Baldwin's written confession (Exh. 21) and that portion of the tape recording the interview with Baldwin (Exh. 20-A); and ruled admissible Angell's written confession (Exh. 22) and that portion of the tape recording Angell's interview (Exh. 20-A). Around 12:15 p.m., after the above interview with Baldwin and Angell, Sergeants Henry and Vietti took Baldwin, at his request, to lunch at the Police cafeteria. After lunch, at 1:20 p.m., in the Police Administration Building, Baldwin executed a hand-written statement (Exh. 21) and acknowledged therein that he had been advised of his constitutional rights, reciting the same. Thereafter the officers interviewed Baldwin and Angell together; the conversation was taped (Exh. 20-A). Sergeant Henry told Angell that Baldwin had made a written confession of the liquor store robbery, then read it to him—Angell entered the store first to see if anyone other than the clerk was present and ordered a six-pack of beer, he (Baldwin) entered the store and stepped to the end of the counter and when the clerk opened the cash register he showed him the gun and demanded the money, the clerk said something and he raised the gun to put a bullet into the wall but he was either off in his aim or the clerk moved his head for when the gun went off the clerk fell to the floor, he told Angell they should get the money and go and he read of the clerk dying a few days later, although he thought the bullet just grazed him. Angell asked Baldwin if he had written the statement; Baldwin replied, "This is the truth, ain't it?" Then Angell told the officers that it was true; that he had gone to the liquor store first and picked up a six-pack of beer; when he was paying for it, Baldwin came in and the robbery took place; he got money out of the cash register. Baldwin said that both of them had taken change out of the register; Angell said

they had taken the whole change tray and thrown it out on the freeway. Angell was asked if he would care to write out a statement; he said he might as well since Baldwin had written one. Thereafter Angell wrote out a statement similar in content to that written by Baldwin (Exh. 22).

The record shows that at the time of arrest and at the outset of the police interview each defendant was fully advised of his constitutional rights; such admonitions were adequate to comply with the mandate of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (*People* v. *Sanchez,* 65 Cal.2d 814, 824 [56 Cal.Rptr. 648, 423 P.2d 800] ; *People* v. *Thomas,* 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233].) Inasmuch as the trial took place before the date of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the standards there laid down are not here controlling. (*People* v. *Rollins,* 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221] ; *People* v. *Rivers,* 66 Cal.2d 1000, 1003 [59 Cal. Rptr. 851, 429 P.2d 171].)

■ Pointing to the guilt of Baldwin, and sufficient to support his conviction, is the undisputed fact of the Silverlake robbery and shooting with a sawed-off .22 rifle; the evidence found in the apartment where Baldwin was arrested—a city map marked very near the location of the Silverlake Liquor Store, a newspaper clipping of the shooting and the sawed-off .22 rifle used in the holdup; and Baldwin's admission that he and another person who carried his sawed-off .22 rifle went to the liquor store, the latter went inside while he waited in the car, he heard a gun go off, and the other person got into his car, said "Let's go" and gave him $30. The fact that Baldwin's admission involved someone other than Angell may be advantageous to Angell but does not any the less serve to implicate Baldwin in the crimes. ■ Although the evidence against Baldwin, excluding his written confession and subsequent oral admissions, is more than ample to sustain his conviction, we point up the conversation between Baldwin and Sergeant Vietti during lunch on March 3, 1965, first, because Angell (who confessed because Baldwin confessed) claims that his oral and written confessions were inadmissible as secured by use of an "illegally obtained confession" "inveigled from Baldwin" by police "in violation of his constitutional right to counsel," and second, because respondent herein (§ 1252, Pen. Code) seeks a reversal of the trial court's ruling that Baldwin's written confession and subsequent oral statements are inadmissible.

Since Angell equates the use of Baldwin's confession with the illegal seizure of the marijuana cigarette in *People* v. *Bilderbach*, 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921], in which defendant's confession was ruled inadmissible as being a "fruit" of an unlawful search and seizure, we are compelled to detail the circumstances surrounding Baldwin's confession in order to establish a complete lack of any illegal police action and to demonstrate the error in the trial court's ruling excluding Baldwin's confession.

According to Sergeant Vietti, around 12:15 p.m. on March 3, 1965, he and Sergeant Henry took Baldwin to their "main office"; while the officers did paper work Baldwin waited to be returned to his cell; the officers said they were going to lunch, and Baldwin asked "if we would take him up there (police cafeteria) with us, so we went to eat"; during lunch Baldwin asked him, "when he was going to the County"; "I told him we were going to file on him the next morning and would arraign him on that same day, and that is when he asked me if that's when he would be assigned a Public Defender, and I said, 'Yes, that's when you are formally charged and that's when you will get the Public Defender.'" Asked three times on cross-examination if Baldwin did not say "I want a lawyer and want to get the Public Defender," Sergeant Vietti emphatically answered that he did not, testifying that "He [Baldwin] did not say 'I want the Public Defender'" at any time. At the preliminary hearing Sergeant Vietti testified that he told Baldwin he had a right to consult a lawyer, "could have an attorney any time he wanted to," but did not tell him "that if he did not have funds he could call a Public Defender," and Baldwin "apparently knew about Public Defenders." (The trial judge did not consider this to be impeaching.) On *voir dire* examination, Baldwin testified that at lunch he told Sergeant Henry he wanted to see a public defender, and asked him if he could do so; Sergeant Vietti answered that when he was arraigned in court the following day he would be given counsel appointed by the judge; he also thought he couldn't get the public defender until he went to court and at that time he believed that he could not have the services of a lawyer before he got to court. (Richard Buckley, then chief deputy public defender, testified that the public defender has responded to requests of suspects after arrest and prior to arraignment, and the public defender is available to them.) Baldwin admitted he had been advised of his constitutional rights, including the right to counsel, when arrested and on March 3, 1965.

Based on the above the trial court made this "tentative finding. . . . That the confession was voluntary; that is, as to Baldwin and was not in violation of his constitutional rights." After other taped interviews were played, Baldwin objected to the admission of his written confession and the tape of his interview made after lunch. He repeated his earlier testimony and said that he first heard of the public defender who represented people without funds, in 1962; since he didn't have any money he "didn't figure" he could get an attorney and did not know that he could talk to the public defender.

After extensive argument the trial judge found in connection with Baldwin's written confession—"There is no question that Mr. Baldwin did not request an attorney. He did not request the services of the public defender, . . ." At this point the trial judge totally committed himself to a rejection of Baldwin's testimony that he told Sergeant Henry he wished to consult with an attorney and wanted to see a public defender, asked if he could do so and said that he wanted to see a public defender as soon as he could (this is somewhat inconsistent with Baldwin's further testimony that at that time he did not know he could talk to the public defender), and accepted as credible the testimony of Sergeant Vietti that at no time did Baldwin say that he wanted a lawyer or the public defender. Continuing, the trial judge said, ". . . but it might be construed that he was misled into thinking that the public defender would not be available for him at the interrogation and not until he actually—the case was filed in court. That could be construed that way. I am quite sure that Mr. Baldwin is sophisticated in the legal arts sufficiently to know better, but take it from there." The judge simply found that Baldwin was not misled into thinking the public defender was not then available.

While we accept the trial judge's factual conclusions as conclusive, they neither establish that the police "inveigled from Baldwin" by "illegal conduct" a written confession in "violation of his constitutional right to counsel" nor, as a matter of law, support the ruling excluding Exhibit 21 (Baldwin's written confession) and Exhibit 20-A (that portion of the tape recording interview with Baldwin). We adhere to this conclusion notwithstanding the trial judge's subsequent vague and meaningless statement, unexplained in the record and wholly unsupported by any of his stated findings and conclusions, that he felt "there is doubt as to anything taken from the defendant Baldwin after the conversation with respect to

availability of the public defender . . . ." Baldwin readily admitted that upon his arrest and the next morning prior to the interview he was advised by the officers of his constitutional rights; Sergeant Buckland testified that when he arrested Baldwin he advised him of his rights and as to counsel told him, "You are entitled to have an attorney with you at all times . . ." and Sergeant Vietti testified to the same effect and as to counsel, "I want to tell you again that you can have an attorney at any time you want. . . ." (Further in his own handwriting at the end of his confession Baldwin acknowledged that he had previously been advised of his consitutional rights.) Thus, inasmuch as the standards laid down in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], are not here controlling (*People* v. *Rollins*, 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221]), and in the light of the trial judge's specific conclusions that Baldwin did not request an attorney, did not request the services of the public defender and was not misled as to the availability of the public defender, there can be no legal basis for the exclusion of Baldwin's confession and subsequent oral statements. The admonitions given by the officers fully complied with the mandate of *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] (*People* v. *Sanchez*, 65 Cal.2d 814, 824 [56 Cal. Rptr. 648, 423 P.2d 800] ; *People* v. *Thomas*, 65 Cal.2d 698. 704-705 [56 Cal.Rptr. 305, 423 P.2d 233]), and while no officer informed Baldwin that a public defender was available, the officers not then subject to the *Miranda* rule were not obliged to so advise him. Certainly neither *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] nor *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], nor any later authority at that time required an officer to volunteer to a suspect that if he had no funds a public defender was available. It should be noted that there is here no evidence that Sergeants Vietti and Henry in fact knew that the public defender was available to Baldwin. While Mr. Buckley testified that the public defender had responded to requests, although not "very many," directly from persons and from officers of various department, he did not say that all officers had been informed of the availability of the public defender by his office. It follows then that having been advised repeatedly of his constitutional rights. having on each occasion acknowledged that he understood those rights, not having asked for counsel or the services of the public defender, not having been misled as to the availability of the public defender and having been

treated by the officers with "courtesy and dignity," Baldwin not only was not denied his constitutional right to counsel but, well understanding the meaning of the *Dorado* admonitions and the effect of waiving his rights, waived the same. (*People* v. *Lara,* 67 Cal.2d 365, 375 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Sanchez,* 65 Cal.2d 814, 825-826 [56 Cal.Rptr. 648, 423 P.2d 800]; *In re Johnson,* 62 Cal.2d 325, 335 [42 Cal. Rptr. 228, 398 P.2d 420].)

However, whether or not we reverse the ruling excluding Baldwin's written confession, which appears to be but a repetition of his prior oral admission of complicity in the holdup, the trial court's conclusions, reached from a consideration of all of the evidence, in no degree establishes either the "lawless conduct of the police" mentioned in *Wong Sun* v. *United States,* 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407] or the "illegal actions of the police" found in *People* v. *Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921], in obtaining Baldwin's confession. Regardless of the ruling excluding the confession, the trial judge's conclusions simply do not justify the application of *People* v. *Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921]. The officers scrupulously advised Baldwin of his constitutional rights. The court found, as borne out by the record, that the officers treated Baldwin with "courtesy and dignity," and that all of his statements, including his written confession, were freely and voluntarily given and no coercion, threats or force were used; and that Baldwin neither requested counsel or the public defender nor was misled into believing that the public defender was not available to him. Not one of these findings supports Angell's proposition that Baldwin's confession was "inveigled" from him by officers in violation of Baldwin's constitutional rights. At no time did the trial court so find or even intimate that there was any illegal conduct on the part of the police; to the contrary, in his discussion before making his ruling he commented, "it might be construed that *innocently* Sergeant Vietti may have misled Mr. Baldwin into thinking the public defender was available at that time," but as hereinabove pointed up, later specifically found that Baldwin had not been misled. The purpose of the exclusionary rule would not be served by excluding Angell's confession as a " 'fruit' tainted" by the Baldwin confession. For whatever reasons Baldwin's confession was excluded, it was not, according to the trial judge himself, because of any illegal or improper conduct on the part of the police.

One cannot read the testimony of Angell and be impressed with his argument that he "did not competently waive his right to counsel." He admitted in his testimony that he was advised of his constitutional rights including his "right to an attorney at any time," by the officer upon his arrest and the next day before his interview; and the record shows that he acknowledged that he understood them. Further at the end of his confession (Exh. 22) in his own handwriting Angell acknowledged that previously he had been advised of his rights. There is no evidence that the officers "concealed" information from Angell that a public defender was available to him; in fact, Angell had no conversation whatever with the officers in which the public defender was even mentioned. Angell merely testified that he was indigent, did not know he could request the public defender prior to the interview or that the public defender was available to him. Sergeant Vietti testified that he did not inform Angell that a public defender was available; and the trial court properly ruled that "It would not be required by the rules laid down by *Escobedo* and *Dorado*." It further ruled that while Angell may then have wished to consult with an attorney "he did not make his wishes known anywhere along the line" and that "his silence" was a "strongly implied waiver of his constitutional right to counsel at the time of this interrogation." In overruling Angell's objection to the receipt in evidence of his written confession, the trial court in effect ruled that Angell intentionally relinquished and abandoned his right to counsel, waiving the same. Angell's own testimony is replete with admissions that he well understood his right to counsel and voluntarily and intelligently waived the same. He answered, "Yes" when asked by his counsel, "Did you understand that if you had the funds you had the right to call an attorney"; and replied, "Most definitely" when asked, "did you want an attorney if you had had funds for an attorney."

The judgments are affirmed.

Wood, P. J., and Fourt, J., concurred.